Amy **HUNTER and Robert Hunter, as next friends of their minor child, Sharon HUNTER** [1], **Plaintiffs,**

v.

### BARNSTABLE SCHOOL COMMITTEE, Defendant.

### Civil Action No. 02–10604–WGY.

United States District Court,
D. Massachusetts.

Oct. 17, 2006.

---

1. In light of the subject matter of the complaint, these are pseudonyms, as is the name of the alleged child perpetrator, against whom no action has ever been taken.

Wendy A. Kaplan, Law Office of Wendy A. Kaplan, Boston, MA, for Plaintiffs.

Joan L. Stein, John M. Simon, Kay H. Hodge, Stoneham, Chandler & Miller LLP, Boston, MA, for Defendant.

*MEMORANDUM AND ORDER*

YOUNG, District Judge.

As a parent, waiting for the school bus to pick up your child for her first day of school is one of America's warmest, most wistful moments. As this case demon- strates, it can also turn into one of a parent's worst nightmares. The plaintiffs, Sharon Hunter and her parents, Amy Hunter and Robert Hunter, (collectively, "the Hunters") bring this action stemming from the alleged sexual harassment of Sharon by an older student on the Barnst- able School District school bus. The Hunters' seek injunctive relief as well as compensatory and punitive damages under Title IX of the Education Act Amendments of 1972. The defendant Barnstable School Committee ("Barnstable") has moved for summary judgment on this lone remaining count.

## I. BACKGROUND

### A. Undisputed Facts

For the purposes of this motion, this Court accepts the Hunters' version of the facts, where supported by record evidence, as true and draws all reasonable infer- ences in the Hunters' favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

During the 2000–01 school year, Sharon Hunter was a kindergarten student at Hyannis West Elementary School of the Barnstable School System. Complaint [Doc. No. 1] ("Compl.") ¶ 13; Defendant's Statement of Material Facts [Doc. No. 32] ("Def.'s Stat.") ¶ 1. Sharon rode the public school bus to and from school. Compl. ¶¶ 15. From September 2000 to February 2001, an older student on the bus, Thomas Brown ("Thomas"), coerced her into lifting her dress, pulling down her underwear, and spreading her legs. *Id.* ¶¶ 20, 30; Plaintiffs' Statement of Material Facts [Doc. No. 35] ("Pls.' Stat.") ¶ 2. This oc- curred every time Sharon wore a dress, which was approximately two to three times per week. Compl. ¶ 20. There are no allegations that the incidents involved any touching.

On the morning of February 14, 2001, Sharon informed her mother, Amy Hunter ("Amy"), and her father, Robert Hunter ("Robert"), about the incidents. *Id.*; Pls.' Stat. ¶ 2. Amy promptly telephoned Hyannis West Principal Frederick Scully ("Scully"). Def.'s Stat. ¶ 3. This was the first time any Barnstable school official learned of the allegations of sexual harassment. *Id.* Amy requested an immediate hearing, and the Hunters met that morning with Scully and Barnstable's Prevention Specialist Lynda Day ("Day"). Def.'s Stat. ¶¶ 3–5. At that meeting, Day, along with Amy, conducted the first interview of Sharon. *Id.* ¶ 6–7.

Sharon was unable to provide Day with enough information to identify the perpetrator, so Scully arranged for Sharon to observe the students departing from the school bus over the next two days.[2] *Id.* ¶¶ 8–9, 14–16. On February 16, 2001, Sharon identified the boy as Thomas, a third grader. *Id.* ¶ 16. Scully and Day interviewed Thomas that same day, but Thomas denied the allegations. *Id.* ¶ 17. Scully then directed Day to interview other students who rode the bus in order to determine if anyone witnessed the harassment. *Id.* ¶ 18. Scully followed up with individual interviews of two of the students, but determined that they were too young to be credible. Pls.' Stat. ¶ 33.

Also on February 16, 2001, the Hunters requested the presence of Officer Edward Deveney ("Deveney") of the Barnstable Police Department. *Id.* at Ex. 3, Resp. 9. Deveney participated in further interviews of both Sharon and Thomas. *Id.* ¶ 17 & Ex. 3, Resp. 9. The following day, Deveney referred the matter to Barnstable Police Department Juvenile Detective Reid Hall ("Hall"). Def.'s Stat., Ex. H, at 2. Hall conducted yet another interview of Thomas and found him credible. Pls.' Stat., Ex. 3, at 29. The Barnstable police closed the case on March 27, 2001, due to insufficient grounds to proceed criminally against Thomas. Def.'s Stat., Ex. J, at 2.

In early March 2001, Day telephoned the Hunters with an offer to put Sharon on another bus. Pls.' Stat. ¶ 35. Since February 14, the Hunters had driven Sharon to and from school. Compl. ¶¶ 22, 25. The Hunters did not consider this a viable option as it seemed inequitable to punish the victim and not the perpetrator. Pls.'s Stat., Ex. 2, at 136. Instead, on March 8, 2001, the Hunters outlined their own demands, which included placing a monitor on the bus, placing two empty rows of seats between the children with disciplinary problems and the kindergarten students, and removing Thomas to another school bus. Def.'s Stat. ¶ 36. Scully responded that he would forward the request for the bus monitor to the Barnstable Superintendent of Schools, Dr. Russell Dever ("Dever"), but that removing Thomas would depend on the police investigation. *Id.*, Ex. H, at 1. Dever and Scully resolved not to agree to these demands, but did agree to a later request by the Hunters to call home immediately at the request of Sharon. Def.'s Stat., Ex. O, at 105–06 & Ex. R, at 1.

The Complaint alleges that the response by Scully and Devers to the allegations of sexual harassment was inadequate. *See* Compl. ¶¶ 58–60. In addition, the Hunters argue that Barnstable's failure to take more stringent action resulted in further harassment. *See id.* ¶ 46. Specifically, the Hunters point to interactions that Sharon had with Thomas the following year in the school hallways and during gym class. *Id.* As a result, during the 2001–02 school

---

2. Sharon failed to identify Thomas on the first day, February 15, while observing the school bus because Thomas did not ride the bus that morning. Pls.' Stat. ¶ 14.

year, Sharon did not use the public school bus, would not participate in gym class, and suffered from an atypical number of absences. *See* Pls.' Stat., Addendum, ¶¶ 6, 7.

### B. Procedural History

On April 3, 2002, the Hunters, on behalf of their minor daughter Sharon, filed a four-count complaint alleging violations of: (1) Title IX of the Education Act Amendments of 1972, 20 U.S.C. §§ 1681 et seq. against Barnstable; (2)-(3) federal and state civil rights under 42 U.S.C. § 1983 and Massachusetts General Laws, chapter 12, sections 11H and 11I against Barnstable and Dever; and (4) discrimination in attendance at school under Massachusetts General Laws, chapter 76, section 5 against Barnstable. Compl. ¶¶ 51–69.

On August 2, 2004, Barnstable and Dever moved to dismiss [Doc. No. 20] all four counts. The United States District Court for the District of Massachusetts, per Judge Keeton, allowed the motion as to the two state law claims and as to the 42 U.S.C. § 1983 claim. The Title IX claim against Barnstable survived the Motion to Dismiss.

On May 31, 2006, Barnstable moved for summary judgment [Doc. No. 30] and filed a supporting memorandum [Doc. No. 31] ("Def.'s Mem.") as to the sole remaining claim. The case was subsequently reassigned to this Court on June 15, 2006. The Hunters responded to the motion for summary judgment with a Memorandum in Opposition [Doc. No. 34] ("Pls.Mem.") on July 31, 2006. Barnstable then filed a reply [Doc. No. 38].

## II. DISCUSSION

### A. Standard of Review

Summary judgment is warranted if, after reviewing the facts in the light most favorable to the non-moving party, no genuine issues of material fact remain and the moving party is entitled to judgment as matter of law. Fed.R.Civ.P. 56(c); *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505; *Calero–Cerezo v. U.S. Dep't of Justice,* 355 F.3d 6, 19 (1st Cir.2004). A "genuine" issue of fact is one that a reasonable jury, on the record before the court, could resolve in favor of either party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A fact is material when it "might affect the outcome of the suit under the governing law." *Hayes v. Douglas Dynamics, Inc.,* 8 F.3d 88, 90 (1st Cir.1993) (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

In making its determination, this Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. The movant has the initial burden of production, which it can meet either by offering evidence to disprove an element of the plaintiff's case or by demonstrating an "absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the movant has met its burden, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548 (internal quotation marks omitted). Genuine factual conflicts will necessitate a trial where the resolution of a disputed fact holds the potential to change the outcome of the case. *Calero–Cerezo,* 355 F.3d at 19.

### B. Title IX Claim

█ Title IX provides, with exceptions not at issue here, that: "No person in the

United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The statute provides for an administrative regulatory scheme directly to enforce the statutory provisions. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 280, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). In *Cannon v. University of Chicago*, however, the Supreme Court recognized that Title IX was also enforceable through an implied private right of action. 441 U.S. 677, 717, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). The Supreme Court subsequently held that monetary damages are available, *Franklin v. Gwinnett County Schs.*, 503 U.S. 60, 76, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), and that sexual harassment of a student by a fellow student ("peer-on-peer" harassment) constitutes actionable discrimination under Title IX, *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 646–47, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999).

■ The Supreme Court, in *Davis v. Monroe County Board of Education*, set forth the standard by which a school system, as a recipient of federal funds,[3] may be held liable for damages under Title IX as a result of peer-on-peer harassment. 526 U.S. at 643–45, 119 S.Ct. 1661. Where, as here, the harassment complained of does not flow directly from an official policy of the school system, no liability for damages will attach unless the district itself is "deliberately indifferent to known acts of student-on-student sexual harassment." *Id.* 646–47, 119 S.Ct. 1661.

■ The Supreme Court explicitly stated that this standard would not be satisfied by theories based upon agency principles, vicarious liability, or constructive notice. *Gebser*, 524 U.S. at 283, 118 S.Ct. 1989. Additionally, it would not present a mere "reasonableness" balancing standard. *Davis*, 526 U.S. at 649, 119 S.Ct. 1661. Instead, "[i]n an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law." *Id.*

■ Thus, Title IX places the burden on the plaintiff in a private right of action claim against a school board to prove that: (1) the student was subjected to harassment severe enough to compromise the victim's educational opportunities; (2) the recipient of the federal funds had actual knowledge of the harassment; and (3) the recipient exhibited deliberate indifference to the harassment. *Wills v. Brown Univ.*, 184 F.3d 20, 26 (1st Cir.1999); *see Davis*, 526 U.S. at 643–45, 119 S.Ct. 1661.

### 1. Harassment Severe Enough to Compromise Education

■ Title IX requires that a student suffer discrimination "on the basis of sex." 20 U.S.C. § 1681(a). Sexual harassment can constitute sex discrimination. *Franklin*, 503 U.S. at 75, 112 S.Ct. 1028. Further, a school system may be liable for the sexual harassment of one student by a fellow student. *See Davis*, 526 U.S. at 643, 119 S.Ct. 1661.

■■ Liability for sexual harassment generally proceeds under either of two theories. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (analyzing sex discrimi-

---

**3.** There is no dispute here that Barnstable is a recipient of federal education funding for Title IX purposes.

nation under a Title VII rubric);[4] *Wills,* 184 F.3d at 25–26. Under the first theory of "quid pro quo harassment," sex discrimination occurs when some benefit or adverse action depends upon the performance of a sexual favor. *Wills,* 184 F.3d at 25. In such a case, sex discrimination is explicit and legally cognizable without a more searching analysis. *See Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 752, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (analyzing a Title VII claim).

▬ The second theory, "hostile environment harassment," allows for gender-orientated conduct to meet the statutory definition of sex discrimination in the absence of explicit threats or where threats were not carried out. *See id.* at 751, 118 S.Ct. 2257. This constructive theory requires a greater evidentiary showing that the victim was subjected to severe or pervasive harassment. *See id.* at 754, 118 S.Ct. 2257; *Wills,* 184 F.3d at 25. Under Title IX, sexual harassment will reach this threshold where the offensive conduct denied the victim full access to and enjoyment of educational opportunities. *See id.; see also Davis,* 526 U.S. at 651–52, 119 S.Ct. 1661.

▬ In assessing the severity of harassment, consideration will be given to the circumstances, expectations, and relationships of the parties. *Davis,* 526 U.S. at 651–52, 119 S.Ct. 1661. In a school setting, it is understandable that students may engage in behavior that would be unacceptable if conducted by adults. *Id.* at 651, 119 S.Ct. 1661; *Doe v. Town of Bourne,* No. Civ.A.02–11363–DPW, 2004 WL 1212075, at *12 (D.Mass. May 28, 2004) (Woodlock, J.) ("[I]ncidents of being pushed into a locker, however objectionable, is [sic] not the type of severe,

perverse, and objectively offensive harassment described in [Davis].") This standard will not be satisfied by mere insults, teasing, or banter, even where comments involve gender and upset the targeted student. *Davis,* 526 U.S. at 651–52, 119 S.Ct. 1661; *see O'Rourke v. City of Providence,* 235 F.3d 713, 729 (1st Cir.2001).

▬ Sexual harassment will reach the severity or pervasiveness required for a viable Title IX claim where it adversely affects the victim's educational opportunities. *Davis,* 526 U.S. at 651–52, 119 S.Ct. 1661 (noting that a decline in grades is evidence of such a link, but is not in itself dispositive on the issue). The required connection between the harassment and educational opportunities, therefore, both assists in defining harassment as severe enough for a cognizable Title IX claim and also limits the scope of such a claim by requiring evidence that educational opportunities were denied. *See Wills,* 184 F.3d at 26.

▬ Here, the harassment Sharon faced far exceeded mere teasing. *See* Compl. ¶¶ 20, 30; *Davis,* 526 U.S. at 651–52, 119 S.Ct. 1661. This conduct, though not physical, is significantly shocking and traumatic to fall outside the scope of inevitable student misconduct. *See Vance v. Spencer County Pub. Sch.,* 231 F.3d 253, 259 (6th Cir.2000) (recognizing harassment from verbal as well as physical abuse). Additionally, coercing Sharon to lift her dress and pull down her underwear does not present conduct "merely tinged" with a sexual connotation, but is outright sexually offensive. *See Frazier v. Fairhaven Sch. Comm.,* 276 F.3d 52, 66 (1st Cir.2002); *Higgins v. New Balance Athletic Shoe, Inc.,* 194 F.3d 252, 258 (1st Cir.1999).

---

**4.** The Supreme Court has largely construed sex discrimination for Title IX purposes *in pari materia* with Title VII. *See, e.g., Gebser,* 524 U.S. at 281, 118 S.Ct. 1989.

The severity and pervasiveness of the harassment are also demonstrated by the effect it had on Sharon's educational opportunities. *See* Pls.' Stat., Addendum, ¶¶ 6, 7. Notably, Sharon did not feel safe taking the school bus to school. She would not participate in gym class after interacting with Thomas. *See id.* She also suffered emotional problems at school that interfered with her education and caused her to stay home from school. *See id.*

While the sexual harassment that Sharon suffered satisfies the Title IX definition, it ended on February 14, 2001 when she stopped riding the school bus. *See* Compl. ¶¶ 22, 25. The Hunters contend, however, that the sexual harassment continued past that date. *See* Pls.' Stat. ¶ 54. Specifically, the Hunters point to further contacts between Sharon and Thomas, including an episode in gym class where she was required to give him a "high-five" and various episodes where Sharon suffered severe anxiety. *Id.* The Hunters argue that these events have further denied her educational opportunities due to the excessive amount of school absences and her inability to attend gym class. *Id.*

The Hunters do not, and cannot, argue that these subsequent incidents and interactions are independently *sexual* in nature. They appear to rely upon a theory of "continuing harassment," similar to the theory raised, but not fully reached, in *Wills. See* Pls.' Stat. ¶ 54; 184 F.3d at 27–28. This Court is apparently invited to view the harassment that occurred on the school bus and the subsequent incidents and interactions together for Title IX purposes. This Court rejects that invitation without reaching whether, on other facts, this theory could prove viable.

Here, hallway interactions and making one give another a "high-five" do not constitute, in themselves, harassing behavior. Sharon's reactions to these events lend credence to the severity of the sexual harassment that occurred on the school bus and evidence the harassment's effect on her education. They do not, however, constitute individual acts of *sexual* harassment. *See Davis,* 526 U.S. at 651–52, 119 S.Ct. 1661. None of the interactions that occurred after February 14, 2001 could be considered within the realm of sexual abuse. *See Meritor Savs. Bank, FSB,* 477 U.S. at 67, 106 S.Ct. 2399. In a school setting, subsequent interactions between students is inevitable. *See, e.g., Theriault v. Univ. of S. Maine,* 353 F.Supp.2d 1, 14–15 (D.Me.2004). It would unduly expand the coverage of Title IX protections to find that incidental interactions at a school between an alleged perpetrator and a victim constitute continuing acts of sexual harassment. As a result, the sexual harassment for purposes of Title IX ceased by February 14, 2001.

### 2. Actual Knowledge of the Sexual Harassment

Whether actual notice existed is matter of fact, but it can be resolved as matter of law where the facts are undisputed. *Doe v. Dallas Indep. Sch. Dist.,* 220 F.3d 380, 384–85 (5th Cir.2000). The Hunters notified Principal Scully of the sexual harassment suffered by Sharon on February 14, 2001. Def.'s Stat. ¶¶ 2, 3. This fact is undisputed. Pls.' Stat. ¶¶ 2, 3.

The actual notice requirement emerges from the contract theory of liability associated with Title IX. It is equitable to impose monetary damages on a school system only where it has notice of the potential liability. *See Gebser,* 524 U.S. at 287, 118 S.Ct. 1989. Generalized complaints by parents will not satisfy this standard. *See Doe v. D'Agostino,* 367 F.Supp.2d 157, 166 (D.Mass.2005) (Tauro, J.); *see also Doe v. Sch. Admin. Dist. No. 19,* 66 F.Supp.2d 57, 63 (D.Me.1999) ("[I]t

is clear that actual notice requires more than a simple report of inappropriate conduct by a teacher.") Notice will, however, satisfy the standard if it is sufficient to alert the school authorities to a probable case of sexual harassment. *See Gebser,* 524 U.S. at 291, 118 S.Ct. 1989.

 Here, it is uncontested that Barnstable had actual knowledge. In addition, there is no dispute between the parties that February 14, 2001 constitutes the date of actual knowledge. The Hunters' phone call and subsequent meetings with Scully present a clear communication of allegations of serious sexual harassment. Scully's reaction to the complaint underscores his knowledge and the seriousness of the charge. Thus, this element of the Title IX standard easily is satisfied.

### 3. Acts with Deliberate Indifference

 Even with actual knowledge of cognizable peer-on-peer harassment, a school district will not be liable for monetary damages unless it acted with "deliberate indifference" to the sexual harassment. *Davis,* 526 U.S. at 648, 119 S.Ct. 1661. The "deliberate indifference" standard requires this Court to determine whether a reasonable fact-finder could conclude that Barnstable's response was "clearly unreasonable in light of the known circumstances." *Id.* This standard attaches liability in situations where the school system intentionally acts in violation of Title IX requirements either through grossly inadequate action or no action at all, and through which this tepid or nonexistent response effectively causes the student to encounter discrimination. *See id.* at 642–43, 119 S.Ct. 1661. If the school system acts in a timely and reasonable manner to end the harassment, it will not be liable under Title IX. *Wills,* 184 F.3d at 26.

 The underlying purpose of this stringent standard is to prevent the diversion and expenditure of public educational funds through imputation of wrongdoing and to impose liability only where the school system had an opportunity to take action to end or limit the sexual harassment and failed to do so. *Gebser,* 524 U.S. at 289, 118 S.Ct. 1989. As a result, this standard is often interpreted strictly to require "an official decision ... not to remedy the violation." *Id.* at 290, 118 S.Ct. 1989; *see also Oden v. N. Marianas Coll.,* 440 F.3d 1085, 1089 (9th Cir.2006) (holding that to surmount the deliberate indifference standard an educational institution need only avoid a deliberate attempt to sabotage the plaintiff's complaint or its orderly resolution).

The Court of Appeals for the First Circuit, however, takes a more plaintiff-friendly approach to this standard. *See Wills,* 184 F.3d at 26. In *Wills v. Brown University,* the First Circuit explains that an institution may be liable if it "learns that its measures have proved inadequate" and fails to take further steps. *Id.* This presents a more liberal approach because a response deemed reasonable initially could later become deliberately indifferent if the school system learns that the sexual harassment continued despite the remedial measures. *See id.* In contrast, the stricter interpretation terminates the inquiry after finding an initially reasonable response. *See, e.g., Oden,* 440 F.3d at 1089.

 The Hunters rely on this more lenient interpretation to argue that Barnstable's reaction to notice of the harassment was clearly unreasonable. Pls.'s Mem. 13. Even under the more liberal interpretation of the First Circuit, however, it presupposes and requires the continuation of the harassment. *See Wills,* 184 F.3d at 26. Remedial measures cannot prove inadequate if no harassment results. *See id.* Here, as discussed above,

the sexual harassment of Sharon ended before Barnstable received actual notice. The Hunters argue that Barnstable, "cannot profit from [Thomas's] lack of future opportunity to harass [Sharon], as the school had nothing to do with that." Pl.'s Mem. 19–20. The liability trigger for a school system under this claim, however, is not the harassment itself, but the deliberate indifference to the harassment. *See Davis*, 526 U.S. at 648, 119 S.Ct. 1661. The Hunters are correct that a school system ought not escape liability through the actions of others, but it also follows that a school system ought not shoulder liability based on speculation as to what might or might not have occurred had Sharon returned to the school bus.

This case is, therefore, similar to the situation in *Wills* where the First Circuit explained:

> [E]vidence of an inadequate response is pertinent to show fault and causation where the plaintiff is claiming that she was harassed or continued to be harassed *after* the inadequate response. But here . . . Will's claim was of a single specific harassment incident that occurred *before* the reprimand and the later complaints.

*Wills*, 184 F.3d at 26–27 (italics in original). The Hunters can point to no sexual harassment that occurred after Barnstable received actual notice. As a result, no evidence exists that Barnstable's reaction effectively "caused" Sharon to suffer additional sexual harassment. *See id.; Davis*, 526 U.S. at 642–43, 119 S.Ct. 1661.

Since no cognizable sexual harassment existed after Barnstable received actual notice, this Court determines, as matter of law, that Barnstable's response is not, nor could be "clearly unreasonable." *See Davis*, 526 U.S. at 649, 119 S.Ct. 1661. As a result, no further discussion is necessary as to the Barnstable's substantive reaction to the harassment claims.

## III. CONCLUSION

Because there are no material facts in genuine dispute and the Hunters cannot allege any cognizable sexual harassment after Barnstable received actual notice, Barnstable's Motion for Summary Judgment [Doc. No. 30] is ALLOWED. Case dismissed.

No doubt the Hunters will view this outcome as officially turning a blind eye and a deaf ear to what they allege to be pervasive acts of sexual harassment which continued over an extensive period of time and served to terrorize and traumatize their innocent daughter during her initial experience with the public schools.

A bus monitor could easily have prevented this harassment.

Yet bus monitors cost money and Barnstable apparently has not so deployed its limited educational resources. The law does not **compel** Barnstable to re-think its fiscal choices in these circumstances. Only a public willingness to shoulder the economic investment necessary to provide first rate public school education can make the changes seemingly required here. This is a problem for the entire community. As Walt Kelly's Pogo so aptly put it, "We have met the enemy and he is us."