# United States Court of Appeals
## For the First Circuit

No. 06-2596

LISA RYAN FITZGERALD, ETC., ET AL.,

Plaintiffs, Appellants,

v.

BARNSTABLE SCHOOL COMMITTEE ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]
[Hon. Robert E. Keeton, Senior U.S. District Judge]

Before

Howard, Circuit Judge,
Selya, Senior Circuit Judge,
and Dyk,*\* Circuit Judge.

Wendy A. Kaplan, with whom Anne Glennon and Law Office of Wendy A. Kaplan were on brief, for appellants.
Emily J. Martin, Lenora M. Lapidus, Sarah R. Wunsch, and American Civil Liberties Union Foundation, Woman's Rights Project on brief for American Civil Liberties Union, American Civil Liberties Union of Massachusetts, Crittenton Women's Union, Equal Rights Advocates, Jane Doe, Inc., Legal Momentum, Massachusetts Society for the Prevention of Cruelty to Children, Dr. Nan Stein, National Partnership on Women & Families, National Women's Law

---

*Of the Federal Circuit, sitting by designation.

Center, Sargent Shriver National Center on Poverty Law, Women's Bar Association of Massachusetts, and Women's Law Project, amici curiae.

Andrea C. Kramer and Sullivan, Weinstein & McQuay on brief for Women's Bar Ass'n of Mass., amicus curiae.

John M. Simon, with whom Kay H. Hodge, Joan L. Stein, and Stoneman, Chandler & Miller LLP were on brief, for appellees.

_____

October 5, 2007

_____

**SELYA**, <u>**Senior Circuit Judge**</u>.  This appeal grows out of allegations that paint a grotesque picture of peer-on-peer sexual harassment at the elementary school level.  The district court, acting initially on a motion to dismiss and thereafter on a motion for summary judgment, resolved the case in favor of the defendants (a school committee and school superintendent).  Although we in no way condone harassment such as is alleged here, we are mindful that school districts and school officials have limited ability to guard against such incidents.  The defendants in this case responded reasonably to the reported harassment — and that is all that the law requires.  Accordingly, even though we disagree with one portion of the district court's decisional calculus, we affirm the judgment below.

## I.  BACKGROUND

The essential facts (some undisputed, some alleged) are outlined in the district court's exegetic opinion on summary judgment, <u>see</u> <u>Hunter</u> v. <u>Barnstable Sch. Comm.</u>, 456 F. Supp. 2d 255, 259-61 (D. Mass. 2006), and we assume the reader's familiarity with

that account.[1] Consequently, we furnish here only a brief synopsis of the details directly relevant to our analysis.

On the morning of February 14, 2001, Jacqueline Fitzgerald, a kindergarten student, informed her parents, Lisa Ryan and Robert Fitzgerald, that each time she wore a dress to school — typically, two to three times a week — an older student on her school bus would bully her into lifting her skirt. Lisa Ryan Fitzgerald believed that these incidents accounted for recent changes in Jacqueline's behavior. She immediately called the principal of Jacqueline's school, Frederick Scully, to report the allegations.

The school system employed a prevention specialist, Lynda Day, whose responsibilities included responding to reports of inappropriate student behavior and instituting warranted disciplinary measures. Scully and Day met with Jacqueline and her parents later that morning. Because school officials were unable to identify the alleged perpetrator from Jacqueline's sketchy account, they arranged for her to observe students disembarking from the school bus.

---

[1]Due to the sensitive nature of the subject matter, the district court employed pseudonyms to mask the protagonists' identities. The parties have opted not to follow the district court's lead; they have filed their briefs and other papers using true names and eschewing any effort at sealing. Under these circumstances, the continued use of pseudonyms would be an empty gesture.

This surveillance took place over the next two days. Jacqueline identified the perpetrator as Briton Oleson, a third-grader. That same day, Scully and Day questioned Briton, who steadfastly denied the allegations. Day then interviewed the bus driver and a majority of the students who regularly rode the bus. Despite these efforts, she was unable to corroborate Jacqueline's version of the relevant events.

Shortly thereafter, the Fitzgeralds told Scully that Jacqueline had furnished additional details about her ordeal. She now said that, in addition to pressing her to lift her dress, Briton had bullied her into pulling down her underpants and spreading her legs. Scully immediately scheduled a meeting with the Fitzgeralds in order to discuss this new information. He also re-interrogated Briton and followed up on some of the interviews that Day had conducted.

By this time, the local police department had launched a concurrent investigation. This probe was handled by a detective specializing in juvenile matters, Reid Hall, who among other things questioned both Jacqueline and Briton. Hall found Briton credible, and the police department ultimately decided that there was insufficient evidence to proceed criminally against him. Relying in part on this decision and in part on the results of the school's own investigation, Scully reached a similar conclusion as to disciplinary measures.

During the currency of these probes, the Fitzgeralds had been driving Jacqueline to and from school. In late February, the school offered to place her on a different bus or, alternatively, to leave rows of empty seats between the kindergarten students and the older pupils on the original bus. The Fitzgeralds rejected these suggestions. The school's primary suggestion — switching buses — attracted special indignation; in the Fitzgeralds' eyes, the school was punishing Jacqueline rather than Briton (who would continue to ride the original bus).

The Fitzgeralds countered with a series of other alternatives, such as placing a monitor on the bus or transferring Briton to a different bus. The superintendent of the school system, Russell Dever, declined to implement any of these proposals.

Although her parents' actions ensured that there were no further incidents aboard the school bus, Jacqueline asserted that she had several unsettling interactions with Briton as the school year progressed. Some were casual encounters in the hallways. The most notable interaction, however, occurred during a mixed-grade gym class. This was an episode in which a gym teacher randomly required Jacqueline to give Briton a "high five."

Each incident was acknowledged by Scully as soon as it was reported, and there is no claim that Scully failed to address

these incidents.  In any event, Jacqueline stopped participating in gym class and began to miss school with increasing frequency.

In April of 2002, the Fitzgeralds sued two defendants — the elementary school's governing body (the Barnstable School Committee) and the superintendent — in the federal district court. Their complaint included (i) a claim against the School Committee for violation of Title IX of the Education Act Amendments of 1972, 20 U.S.C. §§ 1681-1688; (ii) claims against both the School Committee and the superintendent under 42 U.S.C. § 1983; and (iii) a miscellany of state-law claims against both defendants.

In due season, the defendants filed an omnibus motion to dismiss.  Ruling ore sponte, the district court (Keeton, J.) granted the motion as to the section 1983 and state-law claims but denied it as to the Title IX claim.  Following the completion of discovery, the School Committee moved for summary judgment on the latter claim.  The district court (Young, J.) obliged.  See Hunter, 456 F. Supp. 2d at 266.  This timely appeal ensued.

## II.  THE TITLE IX CLAIM

We begin with the plaintiffs' contention that the district court erred in granting summary judgment on the Title IX claim.  We afford de novo review to that ruling and, in so doing, we apply the same legal standards that pertained in the lower court.  See Cabán Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 8 (1st Cir. 2007).  Thus, we may affirm this disposition only if

the facts contained in the summary judgment record, viewed in the light most congenial to the nonmovants (here, the Fitzgeralds), show beyond legitimate question that the movant (here, the School Committee) is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006).

When conducting this tamisage, we must resolve any factual conflicts to the plaintiffs' behoof and draw all reasonable inferences from the facts in their favor. See Houlton Citizens' Coal. v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999). We are free, however, to disregard "conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

We turn next to the substantive law that governs the claim in question. Title IX provides, in relevant part, that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Although the statute does not contain an explicit private right of action as a vehicle for enforcing its commands, the Supreme Court has interpreted it to confer such a right. See Cannon v. Univ. of Chi., 441 U.S. 677, 717 (1979). Under this judicially implied private right of action, aggrieved parties may recover pecuniary

damages for violations. See Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60, 76 (1992).

A school should be a haven for a youngster, and sexual harassment in an elementary school is never to be condoned. But schools and school officials face a daunting challenge in maintaining a safe, orderly, and well-disciplined environment. Where peer-on-peer sexual harassment is alleged, the Title IX framework, as authoritatively interpreted, imposes a distinct set of legal rules. Within that framework, an educational institution — and for present purposes we treat the School Committee, which stands in the shoes of Jacqueline's elementary school, as an educational institution — may be liable for student-on-student sexual harassment in certain limited circumstances. See Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 643 (1999). To prevail on such a claim, a student first must show that the educational institution is covered by Title IX, that is, that the institution is a recipient of federal funding.[2] See 20 U.S.C. § 1681(a). Then, the student must prove that severe, pervasive, and objectively offensive harassment occurred; that the harassment deprived her of educational opportunities or benefits; that the educational institution had actual knowledge of the harassment; and, finally, that the institution's deliberate indifference caused

_____

[2]Here, the affected student and her parents are all plaintiffs. Since the parents' rights are derivative, their presence in the case does not alter the baseline legal rules.

-9-

the student to be subjected to the harassment. See Porto v. Town of Tewksbury, 488 F.3d 67, 72-73 (1st Cir. 2007).

Some comment is in order with respect to this final requirement. Title IX does not make an educational institution the insurer either of a student's safety or of a parent's peace of mind. Understandably, then, "deliberate indifference" requires more than a showing that the institution's response to harassment was less than ideal. In this context, the term requires a showing that the institution's response was "clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648. Relatedly, to "subject" a student to harassment, the institution's deliberate indifference must, at a minimum, have caused the student to undergo harassment, made her more vulnerable to it, or made her more likely to experience it. See id. at 645.

In this instance, three basic points are not in dispute. First, it is uncontradicted that the elementary school is a creature of the School Committee; that the School Committee is a recipient of federal funds; and that, therefore, the School Committee is legally bound to comply with the strictures of Title IX. Second, the parties agree that the School Committee acquired actual knowledge of the school-bus harassment on February 14, 2001 (when Lisa Ryan Fitzgerald reported what Jacqueline had told her). Third, it cannot be gainsaid that, if true, Jacqueline's allegation — that she was forced to pull up her skirt, drop her underpants,

and spread her legs — constituted severe, pervasive, and objectively offensive harassment.

The waters are murkier beyond this frontier. In the district court's view, the plaintiffs' claim turned on a point of law: that a Title IX defendant could not be found deliberately indifferent as long as the plaintiff was not subjected to any acts of severe, pervasive, and objectively offensive harassment after the defendant first acquired actual knowledge of the offending conduct. Hunter, 456 F. Supp. 2d at 263-64. This ruling dictated the outcome because the court found that the later interactions between Jacqueline and Briton — even when viewed in light of the allegations about Briton's previous conduct — did not constitute continued sexual harassment. Id. at 265-66. Title IX liability, the court reasoned, therefore could not attach. Id.

The plaintiffs and the amici assail this statement of the law. They note that other courts have found (or countenanced the possibility of finding) Title IX liability, even though the plaintiff alleged only a single incident of pre-notice harassment. See, e.g., Vance v. Spencer County Pub. Sch. Dist., 231 F.3d 253, 259 (6th Cir. 2000). Along these lines, the Eleventh Circuit has held that Title IX discrimination can occur even after a student has withdrawn from school and left the campus. See Williams v. Bd. of Regents, 477 F.3d 1282, 1297 (11th Cir. 2007). Though removed from the vicinity of her harassers, the victim in Williams could

-11-

still be subject to the <u>university's</u> discrimination, which in that case took the form of a failure "to take any precautions that would prevent future attacks." <u>Id.</u>

Given this well-reasoned line of authority, we conclude that the district court's rationale is flawed. According to its statement of the law, Title IX liability only attaches after an institution receives actual notice of harassment and the institution subsequently "causes" the victim to be subjected to additional harassment. <u>Hunter</u>, 456 F. Supp. 2d at 255-56. To the extent that it held that harassment cannot be "caused" if that harassment never occurs, the district court was on sound footing. Withal, its formulation of the law overly distills the rule set forth by the <u>Davis</u> Court. There, the Court stated that funding recipients may run afoul of Title IX not merely by "caus[ing]" students to undergo harassment but also by "mak[ing] them liable or vulnerable" to it. <u>Davis</u>, 526 U.S. at 645 (quoting <u>The Random House Dictionary of the English Language</u> 1415 (1966)) (internal quotation marks omitted).

This broader formulation clearly sweeps more situations than the district court acknowledged within the zone of potential Title IX liability. <u>See</u>, <u>e.g.</u>, <u>Wills</u> v. <u>Brown Univ.</u>, 184 F.3d 20, 27 (1st Cir. 1999) ("On some cases, merely to maintain a harasser in a position of authority over the victim, after notice of prior harassment, could create new liability."). Under it, a single

-12-

instance of peer-on-peer harassment theoretically might form a basis for Title IX liability if that incident were vile enough and the institution's response, after learning of it, unreasonable enough to have the combined systemic effect of denying access to a scholastic program or activity.[3]  A fortiori, a case such as the one before us theoretically could form a basis for Title IX liability, given that post-notice interactions between the victim and the harasser have been alleged.  The district court therefore erred in truncating its analysis and declining to conduct a broader deliberate indifference inquiry.

Despite this error, we may affirm the district court's entry of summary judgment if that result is supportable on some alternative ground made manifest by the record.  See <u>Houlton Citizens' Coal.</u>, 175 F.3d at 184.  That is the situation here.

To be sure, some of the facts regarding the school's response to the harassment are in legitimate dispute.  For summary judgment purposes, these conflicts must be resolved favorably to

_____

[3]We do not mean to imply that single-incident liability will occur frequently.  <u>See</u> <u>Davis</u>, 526 U.S. at 652-53 ("Although, in theory, a single instance of sufficiently severe one-on-one peer harassment could be said to have such [a systemic] effect, we think it unlikely that Congress would have thought such behavior sufficient to rise to this level in light of the inevitability of student misconduct and the amount of litigation that would be invited by entertaining claims of official indifference to a single instance of one-on-one peer harassment.").  In all events, a single incident of harassment must be such as to produce a "systemic effect on educational programs or activities" in order to engender liability under Title IX.  <u>Id.</u>

-13-

the plaintiffs.  See id.  Other facts, however, are not in legitimate dispute.  Those facts, together with the plaintiffs' version of the genuinely contested facts, create a composite that negates the claim of deliberate indifference.  We explain briefly.

The plaintiffs admit that Scully met with them on the very morning that they notified the school of Jacqueline's plight. They also acknowledge that Scully immediately launched an investigation.  This investigation consisted of multiple interviews of both Jacqueline and Briton, an interview of the bus driver,[4] and individual interviews of between 35 and 50 children who regularly rode the bus.  A number of follow-up interviews were then conducted, including re-interviews of two students who were alleged to have witnessed the critical events.  Furthermore, the school cooperated fully in an investigation undertaken by the local police and took the results of that investigation into account in considering disciplinary options.

Within two weeks after the initial report of harassment (and despite its inability to confirm that the harassment had in fact occurred), the school offered to change Jacqueline's transit

---

[4]The parties dispute whether Day told the bus driver about Jacqueline's allegations at the time of the interview.  We resolve this conflict in favor of the appellants, as we are obligated to do by the summary judgment standard.  It nonetheless suffices, for present purposes, to note that according to both parties' accounts, the driver had an opportunity to report to Day any untoward bus behavior that she had observed — including Briton's — and that she in fact failed to mention any such incidents.

assignment so that she could continue to ride a bus to and from school without being forced to interact with Briton.  The school also suggested, as an alternative, separating kindergarten students from older students by leaving empty a row or two of seats on the bus.[5]

These actions may not have constituted an ideal response to the complaint of harassment.  In hindsight, there may be other and better avenues that the School Committee could have explored or other and better questions that could have been asked during the interviews.  But Title IX does not require educational institutions to take heroic measures, to perform flawless investigations, to craft perfect solutions, or to adopt strategies advocated by parents.  The test is objective — whether the institution's response, evaluated in light of the known circumstances, is so deficient as to be clearly unreasonable.  The response here cannot plausibly be characterized in that derogatory manner.

To begin, the school reacted promptly to the complaint; commenced a full-scale investigation; and pursued the investigation diligently.  As the scenario unfolded, school officials paid close

<hr>

[5]Jacqueline's mother, whom Day called, claims not to recall the school suggesting this "empty rows" alternative.  But she does not affirmatively deny that it was offered.  The defendants proffered documentary evidence (a contemporaneous diary entry by Scully memorializing Day's proposal) to prove the point.  As against this positive evidence, the plaintiffs' negative evidence does not suffice to create a genuine issue of material fact for summary judgment purposes.  See I.V. Servs. of Am., Inc. v. Inn Dev. & Mgmt., Inc., 182 F.3d 51, 55-56 (1st Cir. 1999).

attention to new information, emerging developments, and the parents' concerns. Given its inability to corroborate Jacqueline's allegations and the termination of the police investigation with no recommendation for further action, the defendants' refusal to institute disciplinary measures against Briton was reasonable. See Davis, 526 U.S. at 649 (noting that "it would be entirely reasonable for a school to refrain from a form of disciplinary action that would expose it to constitutional or statutory claims"). Title IX was not intended either to pretermit thoughtful consideration of students' rights or to demand a gadarene rush to judgment. After all, in situations involving charges of peer-on-peer harassment, a public school has obligations not only to the accuser but also to the accused.

The school's prompt commencement of an extensive investigation and its offer of suitable remedial measures distinguish this case from cases in which courts have glimpsed the potential for a finding of deliberate indifference. See, e.g., Vance, 231 F.3d at 262 (concluding that a school could be found deliberately indifferent in the absence of evidence that it "took any other action whatsoever" besides talking with the supposed perpetrator); Murrell v. Sch. Dist. No. 1, 186 F.3d 1238, 1244, 1247 (10th Cir. 1999) (recognizing potential Title IX liability when school principal "refused to investigate" an allegation of

-16-

peer-on-peer sexual harassment and neglected to return parent's telephone calls).

The plaintiffs suggest that the adequacy of the School Committee's response is undermined by its offer of unsuitable remedial alternatives.[6] They point out that they proposed other remedial measures, such as the placement of a monitor on Jacqueline's school bus, which the school rejected. They insist that an educational institution, acting in good faith, would have embraced these proposals. The problem, however, is that this line of argument misconstrues the nature of Title IX liability for peer-on-peer sexual harassment. As we have said, the statute does not require an educational institution either to assuage a victim's parents or to acquiesce in their demands. See Davis, 526 U.S. at 648; see also Porto, 488 F.3d at 73 ("[A] claim that the school system could or should have done more is insufficient to establish deliberate indifference.").

_____

[6]In particular, the plaintiffs say that one of these proposals — the offer to place Jacqueline on another bus — was not a suitable remedial measure because the perpetrator, not the victim, should have been banished from the original bus. In certain circumstances, such an observation might have some bite. See, e.g., Murrell, 186 F.3d at 1247 (finding that school district could be deliberately indifferent where principal responded to rape allegations by alleging consensual sex, leaving the accused male student in school, and suspending the female complainant). Here, however — where the school was unable to corroborate the occurrence of any harassment — its decision to change Jacqueline's transit assignment rather than Briton's can hardly be faulted.

The plaintiffs have a fallback position. They say that the school's investigation, though promptly commenced, was clumsily executed and that, therefore, its response was clearly unreasonable. The plaintiffs' premise is correct; an institutional response to harassment may be carried out so inartfully as to render it clearly unreasonable. See, e.g., Doe v. Sch. Admin. Dist. No. 19, 66 F. Supp. 2d 57, 64-65 (D. Me. 1999). But the plaintiffs' conclusion does not follow. There is no competent evidence here that the school's investigation was bungled.

In this regard, the plaintiffs' attack seems to be more cry than wool. They point out that some investigators found Jacqueline more credible than Briton and that Day may have overlooked one or two of the pupils who regularly rode the bus in question. Moreover, they suggest other investigative avenues that the school might have taken. But investigations involve judgment calls, and the plaintiffs offer nothing to show that the investigative choices made by school officials, whether or not correct in the abstract, were unreasonable. That is vitally important because, in the last analysis, courts have no roving writ to second-guess an educational institution's choices from within a universe of plausible investigative procedures. See Davis, 526 U.S. at 648. For this purpose, a court's proper inquiry is limited to whether the school's actions were so lax, so misdirected, or so poorly executed as to be clearly unreasonable under the known

-18-

circumstances.  See id.  No reasonable juror could find that the investigation here, though imperfect, was unreasonable either in its scope or in its execution.

By the same token, the school's actions, apart from the investigation itself, were within the pale.  We have recognized that if an institution learns that its initial response is inadequate, it may be required to take further steps to prevent harassment. Wills, 184 F.3d at 26.  Here, however, the school responded reasonably each time the Fitzgeralds notified it of new developments.  For example, when Scully learned that Jacqueline's initial version of events had understated the severity of the situation, he met with her parents immediately in order to discuss the new allegations.  When the parents notified Scully, months later, that Jacqueline had been distressed while at school, he promptly disseminated a memorandum to the entire school staff directing all employees to notify him if they either observed Jacqueline crying or had occasion to discipline her.

The fact that subsequent interactions between Jacqueline and Briton occurred does not render the School Committee deliberately indifferent.  To avoid Title IX liability, an educational institution must act reasonably to prevent future harassment; it need not succeed in doing so.  See Davis, 526 U.S. at 648 (explaining that a school need not purge itself of peer-on-peer harassment entirely in order to avoid Title IX liability).

-19-

That ends this aspect of the matter.  Given the facts and the law, no rational factfinder could supportably conclude that the School Committee acted with deliberate indifference in this case. It follows that the district court appropriately granted summary judgment in favor of the School Committee on the Title IX claim.

## III.  THE SECTION 1983 CLAIMS

In addition to the claim brought directly under Title IX, the plaintiffs advanced claims against the School Committee and Superintendent Dever under 42 U.S.C. § 1983.  That statute provides a right of action for any person who, at the hands of a state actor, has experienced "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.  For this purpose, municipal officials are considered to be state actors.  See, e.g., Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 57-58 (1st Cir. 2002).

In this instance, the plaintiffs seek to use section 1983 to redress deprivations of both a federal statutory right (implicating Title IX) and a federal constitutional right (implicating the Equal Protection Clause).  At an early stage of the litigation the district court, ruling from the bench, found these claims precluded under applicable Supreme Court doctrine.  See Middlesex County Sewer. Auth. v. Nat'l Sea Clammers Ass'n, 453 U.S. 1, 19-21 (1981).  Because the court decided this question on a motion to dismiss, its disposition engenders de novo review.  See

-20-

<u>Centro Medico del Turabo, Inc.</u> v. <u>Feliciano de Melecio</u>, 406 F.3d 1, 5 (1st Cir. 2005).  In conducting this review, we consider the statutory claims and the constitutional claims separately.

### A.  **The Statutory Claims**.

Generally speaking, section 1983 may be used to redress the deprivation of a right guaranteed by a federal statute.  <u>See</u> <u>Maine</u> v. <u>Thiboutot</u>, 448 U.S. 1, 4 (1980).  But that general proposition is festooned with exceptions.  One familiar exception is that section 1983 cannot be used to enforce a statutory right when that statute's remedial scheme is sufficiently comprehensive as to demonstrate Congress's intent to limit the available remedies to those provided by the statute itself.  <u>See</u> <u>Sea Clammers</u>, 453 U.S. at 20-21.  This limitation ensures that plaintiffs cannot circumvent the idiosyncratic requirements of a particular remedial scheme by bringing a separate action to enforce the same right under section 1983.  <u>See</u> <u>Smith</u> v. <u>Robinson</u>, 468 U.S. 992, 1009 (1984) (finding section 1983 action precluded when Congress intended plaintiffs to pursue their claims "through the carefully tailored administrative and judicial mechanism set out in the statute").

The plaintiffs do not dispute the force of this principle but, rather, argue that Title IX's remedial scheme is not sufficiently comprehensive to evince Congress's intent to preclude section 1983 enforcement actions.  They point out that the primary means of enforcement set out in the statute itself is the

-21-

withholding of federal funds, see 20 U.S.C. § 1682, and they attach great significance to the fact that this mechanism is rarely used. Thus, they visualize section 1983 actions as a necessary complement to the administrative under-enforcement of Title IX rights.

This argument is poorly conceived. One flaw is that preclusion doctrine is concerned with what Congress intended and what remedies it deemed appropriate — not with how vigorously others (including the Executive Branch) may choose to enforce those remedies. Moreover, taking Executive Branch enforcement into account would work a de facto delegation of legislative power to the Department of Education; in effect, the Department would be granted the power to determine the availability of section 1983 remedies through the modulation of its enforcement activity. Yet we have not been directed to any language in Title IX suggesting such a delegation, and we do not believe that any such language exists.

An even more conspicuous flaw is that the plaintiffs' argument ignores the availability of a private judicial remedy under Title IX itself. See Cannon, 441 U.S. at 717. The case at hand is a paradigmatic example of both the existence and the utility of that remedy.

The plaintiffs would have us disregard the availability of this important anodyne because it is judicially implied rather than discernible on the face of the statute. Although there is some support for that thesis, see Cmtys. for Equity v. Mich. High

Sch. Athl. Ass'n, 459 F.3d 676, 690-91 (6th Cir. 2006); Crawford v. Davis, 109 F.3d 1281, 1284 (8th Cir. 1997), we are not persuaded that this view is correct.

The test for section 1983 preclusion does not turn on whether private causes of action under a particular statutory scheme are explicit or implicit. The dispositive criterion revolves around congressional intent: Did Congress intend the remedial scheme under the statute to be exclusive? See Smith, 468 U.S. at 1012; Bruneau v. S. Kortright Cent. Sch. Dist., 163 F.3d 749, 757 (2d Cir. 1998). That intent may be demonstrated either "by express provision or other specific evidence from the statute itself." Wright v. Roanoke Redev. & Hous. Auth., 479 U.S. 418, 423 (1987). That "specific evidence" goes beyond the explicit provisions of the statute and includes its legislative history. See Smith, 468 U.S. at 1009; see also Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 285 (1988) (stating that since "Congress did not expressly create a private right of action under Title IX, the statutory text does not shed light on Congress' intent with respect to the scope of available remedies").

Several years ago, the Supreme Court conducted a thorough review of the legislative history of Title IX and determined that Congress intended to create a private right of action. See Cannon, 441 U.S. at 694-703. This is the private right of action that courts, including this court, have found to

-23-

be implicit in the text of Title IX.  See id. at 717; Lipsett v. Univ. of P.R., 864 F.2d 881, 884 n.3 (1st Cir. 1988).  We, like the majority of the other courts of appeals that have addressed the issue, believe that this private right of action must be considered as part of the warp and woof of Title IX's overall remedial scheme for purposes of preclusion analysis.  See Bruneau, 163 F.3d at 757; Waid v. Merrill Area Pub. Sch., 91 F.3d 857, 862-63 (7th Cir. 1996); Pfeiffer v. Marion Ctr. Area Sch. Dist., 917 F.2d 779, 789 (3d Cir. 1990).

That conclusion is of decretory significance here.  In all of the cases in which the Supreme Court has found that section 1983 is available to redress the deprivation of a federal statutory right, it has emphasized that the underlying statute did not allow for a private right of action (express or implied).  See City of Rancho Palos Verdes v. Abrams, 544 U.S. 113, 121-22 (2005) (collecting cases).  By contrast, whenever the underlying statute contained a private right of action (express or implied), the Court has deemed that fact to be strong evidence of congressional intent to preclude parallel actions under section 1983.  See id.; see also Sea Clammers, 453 U.S. at 20-21.  Thus, the existence of a private judicial remedy often has proved to be, in practical effect, "the dividing line between those cases in which [the Court has] held that an action would lie under § 1983 and those in which

-24-

[it has] held that it would not." City of Rancho Palos Verdes, 544 U.S. at 121.

The plaintiffs acknowledge that Title IX, as authoritatively interpreted, confers an implied private right of action. They note, however, that this right of action is a more restrictive remedy than that afforded by section 1983. One major distinction is that, unlike section 1983, Title IX does not supply a right of action against individual school officials (such as Superintendent Dever) for monetary relief.

In our view, that distinction makes no difference. Precedent teaches that a remedial scheme can be considered comprehensive for purposes of preclusion analysis without affording a private right of action for monetary relief against every potential wrongdoer. The key case is Smith, in which the Supreme Court discerned a comprehensive remedial scheme sufficient to preclude section 1983 actions despite the total absence of any private rights of action against individual state actors for monetary relief. See Smith, 468 U.S. at 1010-11;[7] Burlington Sch.

_____

[7]We dispose quickly of two straw men. First, the fact that the plaintiffs in Smith brought a section 1983 action in an effort to enforce an underlying constitutional right, not a statutory right, see 468 U.S. at 1007-08, is of no moment. The opinion, fairly read, stands for the proposition that a remedial scheme can be deemed comprehensive even when it excludes important claims against individuals. Second, although Smith's ultimate holding, dealing with attorneys' fees, has been superseded by statute, see 20 U.S.C. § 1415(l), the Supreme Court has continued to cite the decision favorably when considering preclusion issues. See, e.g., City of Rancho Palos Verdes, 544 U.S. at 121. Consequently, we

Comm. v. Mass. Dep't of Educ., 471 U.S. 359, 367 (1985) (describing purpose of Education of the Handicapped Act as the provision of appropriate education "at public expense") (emphasis supplied); see also Sea Clammers, 453 U.S. at 6-7 nn.9 & 11 (noting that neither statute provides for any monetary relief against individual defendants).

Given this precedent, we see no problem in holding section 1983 actions, including section 1983 actions against individuals, precluded by Title IX, even though such a holding would deprive plaintiffs of the right to seek relief against the individuals alleged to have been responsible for conduct violative of Title IX. After all, Title IX "amounts essentially to a contract between the Government and the recipient of funds," Gebser, 524 U.S. at 286 (emphasis supplied), and, accordingly, it makes perfect sense that Congress would aim the weaponry of Title IX at that recipient — not at the recipient's staff. See Waid, 91 F.3d at 862 ("Congress intended to place the burden of compliance with civil rights law on educational institutions themselves, not on the individual officials associated with those institutions."). Sanctioning section 1983 actions against individual school officials would permit an end run around this manifest congressional intent and must, therefore, be deemed precluded. See Williams, 477 F.3d at 1300.

_____

treat it as an instructive precedent.

-26-

To sum up, an action against the offending educational institution itself is what Congress thought appropriate for the enforcement of Title IX's guarantees. In explicating this private right of action, the Supreme Court, consistent with its discernment of Congress's intent, imposed important limits on liability. These include the requirement, in peer-on-peer sexual harassment cases, that the educational institution have actual notice of the harassing conduct. See Gebser, 524 U.S. at 285-86.

It is uncertain whether these circumscriptions would carry over if section 1983 actions were permitted against educational institutions and school officials. Either way, however, such an action would not square with congressional intent. Were the circumscriptions carried over, a section 1983 action would be redundant; were they not, the availability of the action would undermine the implied private right of action that Congress intended. Seen in this light, we think that Title IX's remedial regime is, to borrow a phrase from the Court, "incompatible with individual enforcement under § 1983." Blessing v. Freestone, 520 U.S. 329, 341 (1997).

To say more on this point would be supererogatory. We conclude that the remedial scheme of Title IX is sufficiently comprehensive to demonstrate Congress's intention to preclude the prosecution of counterpart actions against state actors — entities and individuals alike — under section 1983. Accord Williams, 477

F.3d at 1299-1300; <u>Bruneau</u>, 163 F.3d at 756; <u>Waid</u>, 91 F.3d at 862-63; <u>Pfeiffer</u>, 917 F.2d at 789.  We therefore uphold the lower court's ruling that the plaintiffs' Title IX claims, brought under the mantle of section 1983, are precluded.

## B.  **The Equal Protection Claims**.

In addition to precluding section 1983 claims based on the particular federal statutory regime, a sufficiently comprehensive remedial scheme also may preclude constitutional claims that are virtually identical to those that could be brought under that regime.  See <u>Smith</u>, 468 U.S. at 1011 (finding it "difficult to believe" that Congress intended a section 1983 action under the Education of the Handicapped Act given the "comprehensive nature of the procedures and guarantees set out in the [statute]").  Specifically, the <u>Smith</u> Court held that Congress intended the Education of the Handicapped Act (EHA) to be the "exclusive avenue" through which the plaintiff could assert due process and equal protection claims "virtually identical" to their EHA statutory claims.  <u>Id.</u> at 1013.

The parallel to this case is striking: the plaintiffs' equal protection claim is virtually identical to their claim under Title IX.  And they offer no theory of liability under the Equal Protection Clause other than the defendants' supposed failure to take adequate actions to prevent and/or remediate the peer-on-peer harassment that Jacqueline experienced.

-28-

This then brings us to the second step in the inquiry: whether Congress intended these virtually identical constitutional claims to be precluded by Title IX. Smith, 468 U.S. at 1009. We conclude that our previous observations on the possibility of enforcing Title IX through the instrumentality of section 1983 apply with equal force here, notwithstanding the slight differences in context.

The comprehensiveness of Title IX's remedial scheme — especially as embodied in its implied private right of action — indicates that Congress saw Title IX as the sole means of vindicating the constitutional right to be free from gender discrimination perpetrated by educational institutions — and that is true whether suit is brought against the educational institution itself or the flesh-and-blood decisionmakers who conceived and carried out the institution's response. It follows that the plaintiffs' equal protection claims are also precluded.[8]

We add a coda. Our holding on this point should not be read to imply that a plaintiff may never bring a constitutionally-based section 1983 action against an employee of an educational

---

[8]This holding is not in conflict with our decision in Lipsett. Although we allowed concurrent claims under Title IX and section 1983 (premised on equal protection) to proceed in that case, 864 F.2d at 895-96, the issue of preclusion was never raised. Therefore, the opinion has no precedential force with respect to that issue. See Wigginton v. Centracchio, 205 F.3d 504, 511-12 (1st Cir. 2000); Hayduk v. Lanna, 775 F.2d 441, 443 n.1 (1st Cir. 1985).

institution concurrently with the prosecution of a Title IX action. For example, when a plaintiff sues an individual who is himself alleged to be immediately responsible for the injury, such an action may lie regardless of whether the claim sounds in equal protection or some other constitutional theory. See, e.g., Delgado v. Stegall, 367 F.3d 668, 674 (7th Cir. 2004). This is as it should be: when a plaintiff alleges that an individual defendant is guilty of committing an independent wrong, separate and apart from the wrong asserted against the educational institution, a claim premised on that independent wrong would not be "virtually identical" to the main claim.

That is not the case here. The plaintiffs have not named Dever as a defendant based on any independent wrongdoing on his part but, rather, based on his role as the School Committee's ultimate decision-maker. See Appellants' Br. at 52-53. Accordingly, their section 1983 claim against him, like their section 1983 claim against the School Committee, is precluded by Title IX's remedial scheme.

## IV. CONCLUSION

To summarize succinctly, we take into account the totality of the circumstances surrounding the alleged harassment, including events that transpired subsequent to the school-bus encounters. Seen through that wide-angled lens, the School Committee's response cannot, as a matter of law, be characterized

as clearly unreasonable.  Thus, the School Committee cannot be held liable under Title IX for deliberate indifference.  We also conclude that the plaintiffs' claims brought pursuant to section 1983 were properly dismissed on the ground that those claims, as presented in this case, are precluded by Title IX's comprehensive remedial scheme.

This is an unfortunate case.  If Jacqueline's allegations are true, she is a victim — but that is not reason enough to impose on the defendants duties that range beyond the carefully calibrated boundaries of Title IX.  That would be a decision for Congress, not for the courts.  For our part, we need go no further.

**Affirmed**.