# United States Court of Appeals
## For the First Circuit

No. 22-1742

NATASHA GRACE; MINOR CHILD MG; MINOR CHILD MG2; MINOR CHILD MG3;
MINOR CHILD AG; MINOR CHILD MP,

Plaintiffs, Appellants,

v.

BOARD OF TRUSTEES, BROOKE EAST BOSTON; BROOKE SCHOOL FOUNDATION,
INC.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Gelpí, Lynch, and Howard,
Circuit Judges.

Esthena Barlow, with whom Romanus C. Maduabuchi, Matthew
Calabrese, Elliott O'Brien, Nathan Winshall, Brian Wolfman,
Madeline Meth, Keypoint Law Group, LLC, and Georgetown Law
Appellate Courts Immersion Clinic were on brief, for appellants.
John J. Cloherty III, with whom Pierce Davis & Perritano LLP
was on brief, for appellees.

October 19, 2023

**GELPÍ**, **Circuit Judge**.  Minor Child MG ("MG") alleges that he was harassed by his classmates over a three-year period while he was a student at Brooke Charter School East Boston ("Brooke East Boston" or the "school").  Appellant Natasha Grace ("Grace"), MG's mother, on behalf of herself, MG, and his four minor siblings, brought suit against appellees Brooke East Boston, its Board of Trustees, and Brooke School Foundation, Inc. (collectively, "Brooke"), asserting claims under Title IX of the Education Amendments of 1972, the Equal Protection Clause of the Fourteenth Amendment, and Massachusetts state law.  The United States District Court for the District of Massachusetts granted Brooke's motion for summary judgment on all claims.  Grace appeals only the district court's dismissal of her Title IX claim.  We reverse the grant of summary judgment on Grace's Title IX claim and remand for further proceedings consistent with this opinion.

## I. Background

We begin by outlining the school's Code of Conduct and Bullying and Prevention Policy, as well as the school officials responsible for their enforcement.  We then turn to the events that led to this case.  For purposes of summary judgment, we describe the facts in the light most favorable to the nonmovant, Grace, drawing all reasonable inferences in her favor.  See, e.g., López-Hernández v. Terumo P.R. LLC, 64 F.4th 22, 28 (1st Cir. 2023).

**A. Brooke Charter Schools**

Brooke East Boston is a K-8 school that is part of Brooke Charter Schools (the "Schools"), a network of three K-8 public charter schools and one high school, each located in Boston, Massachusetts. The Schools are governed by a Board of Trustees and receive financial support from Brooke School Foundation, Inc., a 26 U.S.C. § 501(c)(3) nonprofit fundraising entity.

**1. Code of Conduct**

The Schools' Code of Conduct ("Code") provides a set of offenses for which a student will be subject to disciplinary consequences. Under the Code, a student will receive a "Community Violation," a sheet that the student's parents must sign and return to the relevant school, if they commit a "serious infraction to [the Schools'] core values." Serious infractions include name-calling or insulting a fellow student, engaging in "unsafe behaviors," such as hitting a fellow student, and using inappropriate language. These infractions may occur on school grounds, while a student is off school grounds if the offense results in a substantial disruption to the learning environment, or on the school bus.

**2. Bullying and Prevention Policy**

The Schools also have a Bullying and Prevention Policy ("Policy"). The Policy defines bullying, in relevant part, as the repeated use by one or more students of a written or verbal

expression, or a physical act or gesture, directed at a target that causes physical or emotional harm to the target or creates a hostile environment at school for the target. Under the Policy, acts of bullying may include teasing, name-calling, spreading rumors, physical altercations, and other consistent aggressive behaviors. The Policy recognizes that "certain students may be more vulnerable to become targets of bullying, harassment, or teasing based on actual or perceived characteristics" such as sex, sexual orientation, and gender identity. According to the Policy, the school will "identify specific steps it will take to create a safe, supporting environment for [these] vulnerable populations in the school community."

The Policy further outlines the procedures for reporting and responding to bullying. School officials are required to transmit any bullying incident directly and immediately to the relevant school's Dean of Students ("Dean"). The Dean will promptly investigate the reported incident, considering all known and available information, and make a written record of the investigation. After the investigation, the Dean will determine whether, in light of the facts and circumstances, the allegations of bullying are substantiated. If so, the Dean will then ensure that "[t]he target[] is made to feel safe" and that the aggressor faces disciplinary action. Within a reasonable time following the incident, the Dean will contact the target to assess whether there

has been a recurrence of the prohibited conduct and whether additional supportive measures are needed.

### 3. School Officials

During MG's time at Brooke East Boston, Jon Clark ("Co-Director Clark" or "Clark") served as the Schools' Network Co-Director and was responsible for the successful operation of the Schools. Clark reported directly to the Board of Trustees. At Brooke East Boston, Molly Cole ("Principal Cole" or "Cole") served as the Principal and was responsible for the supervision of the school. Cole reported directly to Clark and delegated some of her responsibilities to the Assistant Principals, Katherine Kirby and Heidi Deck. Cole and the Assistant Principals were responsible for investigating reported incidents between a teacher and a student ("teacher-related incidents").

Brooke East Boston's Dean of Students was Yasenia Dudley ("Dean Dudley" or "Dudley"), whose primary responsibility was to enforce the Code. In her role as Dean, Dudley was also responsible for enforcing the Policy by investigating allegations of bullying and harassment and for taking disciplinary action against aggressors. Dudley submitted the written reports of her investigations to either Principal Cole or the Assistant Principals. Dudley was also responsible for supervising student detentions and the school's bus monitors.

**B. Alleged Incidents of Harassment**

We now turn to the events giving rise to this action, which occurred from 2015 to 2018, during MG's fourth, fifth, and sixth grades at Brooke East Boston.

**1. Fourth Grade**

Around August 2015, at the beginning of MG's fourth grade at Brooke East Boston, MG's classmate MV pushed MG on two separate occasions. At the request of Grace, Dean Dudley spoke with MV, who admitted to intentionally pushing MG and received two Community Violations for his conduct. On August 28, 2015, Grace emailed Co-Director Clark and informed him of the incidents. In her email, Grace expressed frustration over how the school handled the situation, since it was not until after MV had twice pushed MG that Dean Dudley intervened. Grace also informed Clark of a different incident "in which [MV] ha[d] tripped [MG] and pushed him again and [MV said that] he didn't." After expressing concern over the ongoing situation, Grace requested that Clark follow up with her.

Upon receiving Grace's email, Clark contacted Principal Cole, who informed him that the incidents had been addressed "in a satisfactory way." After talking to Cole, Clark concluded that there were "[no] grounds for further involvement" from him. The parties dispute whether the incidents were appropriately characterized and addressed by the school. While Cole concluded

that the incidents did not constitute bullying but rather "peer-to-peer conflict," Grace argues that they amounted to bullying under the Policy.

As we recount below, this was not the last time that school officials would characterize an incident between MG and MV as peer-to-peer conflict. The record reflects that "peer-to-peer conflict" is not a school-defined term, nor is it defined by the Code or the Policy. Rather, when asked how he defined "peer-to-peer conflict" as opposed to bullying, Co-Director Clark answered that he was "just using common sense."

According to MG, MV also called him names such as "bitch," "girl," and "gay" throughout the fourth grade. The record, however, contains no evidence that these instances of name-calling were reported to school officials during the fourth grade.

## 2. Fifth Grade

MG began fifth grade at Brooke East Boston in the fall of 2016. On December 7, 2016, there was an incident (hereinafter the "bus incident") between Bus Monitor Anitra Reed ("Bus Monitor Reed" or "Reed") and MG. While on the school bus and within MG's earshot, Reed asked a student whether she liked MG. The student replied that she did not like MG because "the whole school thought [he] was loud and gay." MG heard the student's response. What happened next is disputed. During her deposition, Grace stated that Reed then turned to MG and told him to "watch his flamboyant

- 7 -

hands -- the way he move[s] his hands and the way he talks."[1] However, when Dean Dudley was asked about the incident, she recalled that Reed had merely relayed to MG what the student said. From the record, it appears that, during MG's deposition, he was not specifically asked what Reed told him on the bus.

Dean Dudley recalled learning about the bus incident through a verbal report from either MG or Reed. Dudley investigated the incident by speaking to "all of the parties involved to figure out what happened." While she could not remember the exact outcome of her investigation during her deposition, Dudley stated that there was a "conversation that was had" with Reed. Dudley, along with either Principal Cole or an Assistant Principal, concluded that the student would face no disciplinary action for her comment because, in their view, her remarks were directed at Reed, not MG. Despite Dudley's statement

---

[1] Brooke argues that Grace improperly relies on this hearsay testimony. This argument, however, fails for two reasons. First, Grace's testimony could "be presented in a form that would be admissible in evidence." Martínez v. Novo Nordisk Inc., 992 F.3d 12, 18 (1st Cir. 2021). As Grace contends, when a party objects that material cited to support a fact cannot be presented in a form that would be admissible in evidence, the burden is on the proponent to explain the admissible form that is anticipated. See Fed. R. Civ. P. 56(c)(2) advisory committee's note to 2010 amendment. Here, Grace has met that burden by explaining that MG could present Reed's statement in a form that would be admissible in evidence through his own testimony at trial. See Martínez, 992 F.3d at 18. Second, even excluding Reed's alleged statement, the record demonstrates that Dudley was aware that, at a minimum, Reed told MG that a student did not like him because the student thought he was gay.

that there was a "conversation that was had" with Reed, the school admitted that no corrective action was taken against Reed.

The next day, on December 8, 2016, MG met with Dean Dudley and reported that students were calling him "gay" and "transgender." After meeting with Dudley, MG went to Nissan's classroom, where he also reported to Nissan that students were calling him "gay" and "transgender" but that he was not gay nor did he want to be transgender. When MG returned to the classroom with his classmates after recess, he found a book on his desk with a note from Nissan (hereinafter the "Gracefully Grayson incident"). The note read, "If you want to read about this, just for interest! (If not, you can give it back to me)."

The book was "Gracefully Grayson," a novel by Ami Polonsky that provides a fictional account of a transgender child. The book was not assigned as class reading nor was the book part of the Health Education curriculum. Students were familiar with the book because it was a "very popular book[] in [Nissan's] classroom." Whether other students saw the book on MG's desk is unclear. During his deposition, MG stated that he did not know if other students saw the book on his desk before he put it away. However, MG also stated that, after the incident, students called him "names or gay[] because they [saw] that a teacher had gotten in the mix[] so they believed it was true."

MG reported the Gracefully Grayson incident to Dean Dudley. Dudley classified the incident as teacher-related, relayed the information to either Principal Cole or an Assistant Principal, and "they took it over from there." There is no evidence of an investigation into this incident.

On December 9, 2016, Grace emailed Co-Director Clark. She wrote that a "student at the school (last year) started sending a rumor around that [MG] was gay or wanted to be[] transgender." Grace then informed Clark of the Gracefully Grayson incident, telling him that MG felt offended by the situation and that Nissan could have "caused [MG] to harm himself or others if he had a different mindset." Grace expressed frustration over the fact that she met with Principal Cole and Cole's only response was that she "[did not] feel [that Nissan's actions] came from a bad place." Upon receiving Grace's email, Clark called Cole, who told him that she had already heard Grace's concerns. Clark then felt that "there was no action[] that was warranted for [him] to take."

Clark did not consider it inappropriate that Nissan recommended the book to MG; instead, he stated that it was a "reasonable thing to do." It is undisputed that the school took no corrective action against Nissan. Nothing more was done to address this incident.

After the Gracefully Grayson incident, MG's mental health quickly deteriorated, and he began therapy. MG was

diagnosed with major depressive disorder, anxiety disorder, and post-traumatic stress disorder.

Around January 2017, both MG and MV reported that they were shoved by each other in the school's hallway. After talking to the students, Dean Dudley issued each of them Community Violations. The parties again dispute whether the incident was properly characterized and addressed by the school. While the school again characterized the incident as peer-to-peer conflict, Grace contends that it was MV who shoved MG and that the incident again amounted to bullying under the Policy.

On January 17, 2017, there was yet another physical altercation between MG and MV. During recess, MV hit MG's head, and MG hit MV back. Both students were disciplined as a result of this incident. The school again characterized the incident as peer-to-peer conflict, and Grace again counters that the incident qualified as bullying under the Policy. On January 19, 2017, after Dean Dudley informed Grace of the altercation, Grace filed an Incident Report with the Boston Police Department.

### 3. Sixth Grade

The final incidents giving rise to this action occurred around and during MG's sixth grade at Brooke East Boston. During the summer of 2017, while at a summer camp, a girl referred to MG as "gay" without his knowledge (hereinafter the "summer incident"). While the summer camp was not affiliated with Brooke

- 11 -

East Boston, the girl was also a sixth-grade student at the school. In September of that year, MG learned of the summer incident from another student at the school. On September 13, 2017, Grace informed Dean Dudley of the incident. Dudley then interviewed "the students that were involved" and concluded that there were no grounds to take disciplinary action against any student because the incident had occurred at a summer camp, not at the school. Dudley informed Co-Director Clark of the incident and her conclusion.

During sixth grade, as MG grew anxious and defensive, his disciplinary offenses significantly increased. His relationship with his sixth-grade teacher, Katrina Freund ("Freund"), quickly deteriorated. While MG received no more than ten Community Violations between the fourth and fifth grade, MG recalled receiving approximately one hundred Community Violations during the sixth grade, most of which were issued by Freund. According to Freund, MG initiated confrontations with her, arrived late to class, refused to obey her directions, refused to stop talking during class, and generally exhibited defiant classroom behavior.

Around November 2017, Grace requested a meeting with Freund, Assistant Principal Kirby, and MG's therapist, Paulette Sewell, to formulate a plan that would improve the relationship between MG and Freund. At the meeting, it was agreed that MG and

Freund would use a notebook to better communicate with each other whereby MG would write how he felt at any given moment and Freund would respond. Freund, however, never responded to what MG wrote in the notebook. The notebook plan was thus ineffective in improving the relationship between MG and Freund.

Around January 2018, Grace contacted Dean Dudley and requested a meeting to discuss transferring MG to another classroom, as she was no longer comfortable with MG being in Freund's classroom. Dudley then emailed Assistant Principal Kirby to schedule the meeting between Kirby and Grace, informing Kirby that the relationship between MG and Freund had become strained. There is no evidence that Kirby responded to the email or met with Grace. Around February 2018, Grace again contacted Dudley to discuss moving MG to a different classroom. Dudley again emailed Kirby. Whether Kirby and Grace ever met is unclear. But despite Grace's repeated requests to transfer MG out of Freund's classroom, and despite the school having three sixth-grade classrooms that academic year, it is undisputed that the school declined to move MG out of Freund's classroom.

Around February 2018, Reed overheard two upper-grade students refer to MG as "skittles," meant as a derogatory term for a gay person. Reed then took the students to Dean Dudley's office and informed Co-Director Clark of the incident. After talking to the students, Dudley issued them detentions. Dudley determined

- 13 -

that this incident was not bullying or harassment but rather teasing and name-calling.

Around March 2018, Grace informed Dudley of an interaction between MG and Alyssa Mackey ("Mackey"), a seventh-grade teacher at the school. According to Grace, Mackey told MG, "You may be a problem for other teachers, but you won't be a problem for me." Since Mackey was an upper-grade teacher who had no prior interactions with MG, Grace was concerned that other teachers at the school were spreading rumors about MG's behavior and "labeling" him. Because this was a teacher-related incident, Dudley informed Assistant Principal Kirby. There is no evidence that Kirby, or any other school official, investigated this incident. It is undisputed that the school took no corrective action against Mackey.

The last alleged incident involving MG and MV occurred on May 17, 2018. While at a playground near the school, MV was involved in a fight with other students. MG did not participate in that fight. However, as teacher Sarah Geary ("Geary") walked MV back to the school, they ran into MG. What happened after that is disputed. According to Co-Director Clark, MV "flail[ed] his arms at MG" attempting to "get[] at him," but Geary stood between them, preventing anything further from happening. According to Dean Dudley, however, MV "put his hands on [MG]." MV was

suspended.  Clark investigated the incident and concluded that it was not bullying but rather an "attempt at a physical altercation."

The final alleged incident giving rise to this action occurred on May 18, 2018, involving MG and Freund (hereinafter the "Post-it notes incident").  The facts of this incident are disputed.  According to Freund, she was passing out Post-it notes for students to take notes while they read during class.  After MG told Freund that he did not want any Post-it notes, she "tossed a few onto his desk, as [she] had done with the previous ten or so students."  Freund recalled that MG then "held up his hand to block the [Post-it notes] and they hit his hand."  MG, however, contends that Freund "threw a stack of post-it notes" at his face.

Immediately after the Post-it notes incident, MG left the classroom and contacted Grace, who then drove to the school.  What happened after that is also disputed.  Freund contends that Grace entered her classroom while class instruction was ongoing and yelled statements at her such as "this will be your last day" and "you're a liar."  Grace, however, counters that when she arrived at the school, Dean Dudley gave her permission to go to Freund's classroom, where she calmly but unproductively discussed the incident with Freund.

That same day, Grace asked Dudley to investigate the Post-it notes incident.  Dudley talked to a student who had been in the classroom with MG and Freund during the incident.  The

student told Dudley that Freund had, in fact, thrown Post-it notes at MG which hit him. Dudley relayed this information to Co-Director Clark and Assistant Principal Kirby. On May 21, 2018, however, Clark investigated the incident himself and concluded that Freund did not throw the Post-it notes at MG and that MG was "actively working to engineer the firing of [Freund] without cause." It is undisputed that the school took no corrective action against Freund. After the incident, Grace retained counsel.

On May 22, 2018, through her attorney, Grace delivered a Demand Letter to Co-Director Clark, Principal Cole, Assistant Principal Kirby, and Dean Dudley, demanding that the school create "an action plan [to protect MG] from all the targeting, bullying, [and] retaliation." The letter described incidents where MG had allegedly been the victim of bullying and harassment through repeated name-calling, hate speech, and discriminatory remarks from both students and school officials. The letter further stated that Grace was available to meet on May 23, 2018, to discuss her demands before MG returned to the school.

The next day, on May 23, 2018, instead of meeting with Grace, Co-Director Clark issued Grace a No Trespass order. The order stated that Grace's actions on May 18, 2018, "constituted a major disruption to the school" and that she was thus prohibited from entering school grounds absent an emergency or Clark's

- 16 -

permission.  After receiving the No Trespass order, Grace withdrew MG from Brooke East Boston.

## C. Procedural History

Grace, on behalf of herself, MG, and his four minor siblings, brought suit against Brooke in Massachusetts state court, alleging claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a); the Equal Protection Clause of the Fourteenth Amendment; and Massachusetts state law.  Brooke removed the action to the United States District Court for the District of Massachusetts[2] and moved for summary judgment on all claims.

In a Report and Recommendation ("R&R"), a magistrate judge recommended the dismissal of all claims except for Grace's Title IX claim.  After thoughtfully analyzing three years of facts, the magistrate judge concluded that, while the question of summary judgment was a close one, the Title IX claim would be better resolved by a jury at trial.  First, the magistrate judge determined that a jury could find that the claimed harassment was on the basis of sex.  Second, the magistrate judge concluded that a jury could also find that the school exhibited deliberate indifference to the claimed harassment.

---

[2] Removal was pursuant to the district court's federal question jurisdiction.  See 28 U.S.C. §§ 1331, 1441.

The district court, however, upon considering Brooke's objections to the R&R,[3] granted summary judgment in favor of Brooke on all claims, including the Title IX claim. In the district court's view, Brooke had taken "timely and plausibly reasonable measures to investigate and end the claimed harassment" by frequently communicating with Grace and conducting "a variety of investigations in response to reported incidents adverse to [MG]." Thus, according to the district court, Grace had failed to demonstrate a triable issue of fact as to whether the school exhibited deliberate indifference to the claimed harassment.

This appeal followed.

## II. Discussion

On appeal, Grace challenges only the district court's dismissal of her Title IX claim. The parties dispute whether the incidents alleged constituted harassment, and if so, whether it was on the basis of sex, and whether the school exhibited deliberate indifference to it. The district court, however, disposed of Grace's Title IX claim solely on the ground of deliberate indifference. Thus, we write narrowly and focus our attention on whether a reasonable jury could find that Brooke acted

---

[3] After the magistrate judge issued the R&R, Brooke objected to the R&R's recommendation that Grace's Title IX claim should not be dismissed. The district court then made a de novo determination and dismissed the Title IX claim. See 28 U.S.C. § 636(b)(1)(C) ("A judge of the court shall make a de novo determination of those portions of the . . . [R&R] to which objection is made.").

- 18 -

with deliberate indifference in responding to the alleged harassment.

## A. Standard of Review

We review the district court's grant of summary judgment de novo, construing the record in the light most favorable to the nonmovant, Grace, and drawing all reasonable inferences in her favor. López-Hernández, 64 F.4th at 28; Camar Corp. v. Preston Trucking Co., 221 F.3d 271, 274 (1st Cir. 2000). Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute as to a material fact exists if a rational factfinder, viewing the evidence "in the light most flattering to the party opposing" summary judgment, could resolve the dispute in that party's favor. See Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995). "When determining if a genuine dispute of material fact exists, 'we look to all of the record materials on file, including the pleadings, depositions, and affidavits' without evaluating 'the credibility of witnesses []or weigh[ing] the evidence.'" Taite v. Bridgewater State Univ., Bd. of Trs., 999 F.3d 86, 93 (1st Cir. 2021) (alterations in original) (quoting Ahmed v. Johnson, 752 F.3d 490, 495 (1st Cir. 2014)).

**B. Student-on-Student Harassment Under Title IX**

Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has recognized an implied private right of action under Title IX through which an aggrieved party may seek money damages against an educational institution. See Cannon v. Univ. of Chi., 441 U.S. 677, 717 (1979); Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 65 (1st Cir. 2002).

Here, Grace asserts a theory of hostile environment harassment under Title IX. Under that theory, Brooke, as a federal funding recipient, can be liable for a claim of student-on-student and teacher-to-student harassment. See Porto v. Town of Tewksbury, 488 F.3d 67, 72 (1st Cir. 2007). To prevail on such claim, a student must show that they were (1) "subjected to harassment" (2) on the basis of sex; (3) "that the harassment was sufficiently severe and pervasive to create an abusive educational environment;" and (4) "that a school official authorized to take corrective action . . . exhibited deliberate indifference to" the harassment. Frazier, 276 F.3d at 66; see also Porto, 488 F.3d at 72-73.

The deliberate indifference standard can be characterized as a two-pronged test. First, the funding recipient must have had actual knowledge of the harassment. See Santiago v. Puerto Rico, 655 F.3d 61, 73 (1st Cir. 2011). This actual knowledge requirement demands that the official who is informed of the harassment be an "appropriate person" -- an official of the recipient entity with authority to take corrective action to end the harassment. See id. at 74.

Second, the official's "response [to the harassment] must amount to deliberate indifference to discrimination." Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290 (1998). School officials are deliberately indifferent to student-on-student harassment "only where [their] response to the harassment, or lack thereof, is clearly unreasonable in light of the known circumstances." Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 648 (1999). The response must, at a minimum, cause the student to undergo harassment or make the student vulnerable to it. See id. at 645. A school might be deliberately indifferent to harassment where it had notice of the harassment and "either did nothing or failed to take additional reasonable measures after it learned that its initial remedies were ineffective." See Porto, 488 F.3d at 73-74; see also Wills v. Brown Univ., 184 F.3d 20, 26 (1st Cir. 1999). Thus, deliberate indifference "will often be a fact-based question, for which bright line rules are ill-suited." Doe ex

rel. Doe v. Derby Bd. of Educ., 451 F. Supp. 2d 438, 447 (D. Conn. 2006).

## C. The District Court Should Not Have Granted Summary Judgment in Favor of Brooke on the Title IX Claim

### 1. Actual Knowledge

A reasonable jury could find that MG was subjected to harassment. We turn to the actual knowledge requirement of the deliberate indifference standard under Title IX. Brooke does not dispute that Dean Dudley and Co-Director Clark, in their respective roles as school officials, had the authority to take corrective action to end the discrimination against MG and thus were "appropriate person[s]" under the statute. See Santiago, 655 F.3d at 74. Brooke, however, contends that Grace "vainly attempt[s] to attach liability by pointing to alleged incidents of harassment of which the School had no actual knowledge." We are unconvinced.

Construing the record in the light most favorable to Grace, a jury could find that the school had actual knowledge as of December 7, 2016 (the date of the bus incident), but not before then. The record shows that, on December 7, 2016, Dean Dudley became aware, from the bus incident, that there were students who were discriminating against MG because they thought he was gay. Dudley was also on notice that, at a minimum, Reed relayed that information to MG. On December 8, 2016, MG personally reported to Dudley that students were calling him "gay" and "transgender." Both Dudley and Clark had actual knowledge that after MG reported

the same to Nissan, she left a book on his desk about a transgender child. Clark, in particular, knew that the Gracefully Grayson incident offended MG and that Grace was unsatisfied with Principal Cole's response to Nissan's actions. Grace even informed Clark that, prior to the incident, a student had started a rumor that MG was gay.

The record further reveals that, throughout MG's sixth grade, Dudley and Clark remained on notice of students' treatment of MG. They both had actual knowledge that, during the summer of 2017, a Brooke student referred to MG as "gay" and MG learned of the incident from another student at the school. Around February 2018, Dudley and Clark both learned that two upper-grade students referred to MG as "skittles." Throughout the sixth grade, Dudley also remained on notice of MV's treatment of MG. In light of these facts from MG's fifth and sixth grades at Brooke East Boston, a reasonable jury could infer that the school had actual knowledge as of December 7, 2016, but not before then. See id. at 73-74.

### 2. Deliberate Indifference

Having determined that Grace presented sufficient evidence on the actual knowledge requirement to survive summary judgment on that point, we now turn to the school's response to the claimed harassment. The district court found that "[n]o reasonable jury could find on the factual record[] that [the

school's] response to reported incidents of sex-based harassment was clearly unreasonable." We again disagree.

When construed in the light most favorable to Grace, the record supports the inference that the school's response to the claimed harassment was "clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648. For more than a year, from December 2016 to February 2018, school officials at Brooke East Boston took no corrective or remedial action against students who repeatedly used homophobic epithets against MG. On December 8, 2016, after the bus incident, MG himself reported to Dudley that students were calling him "gay" and "transgender." Yet, even though Dudley had prior notice of students' treatment of MG from the bus incident, there is no evidence that she investigated the name-calling, nor is there evidence that she took steps to protect MG from it.

The record further supports the inference that, during the sixth grade, the school's responses to the claimed harassment were still not reasonably calculated to stop students' treatment of MG. Only once did the school discipline students for using homophobic epithets against MG: when two upper-grade students called him "skittles" in February 2018.

Grace has also produced sufficient evidence for a reasonable jury to find that the school exhibited deliberate indifference by repeatedly characterizing MV's treatment of MG as

"peer-to-peer conflict" as opposed to bullying in light of MV's constant aggressive behavior towards MG.  See Gebser, 524 U.S. at 290; Davis, 526 U.S. at 645.  Under the Policy, acts of bullying include teasing, taunting, physical or verbal altercations, and other consistent aggressive behaviors.  Yet, when MV twice pushed MG, the school characterized the incident as peer-to-peer conflict.  In January 2017, when MV hit MG's head, the school again characterized the incident as peer-to-peer conflict.  In May 2018, when MV either "flai[ed] his arms at MG" or "put his hands on [MG]" after being involved in a fight with other students, the school again refused to characterize the incident as bullying, notwithstanding MV's consistent aggressive behavior towards MG.

A reasonable trier of fact could also find that the school's responses to the individual actions and events perpetrated by different school officials were unreasonable in light of the known circumstances.  See Davis, 526 U.S. at 645, 648.  We begin with the bus incident, in which Reed initiated a conversation, knowingly within MG's earshot, and a student responded that she did not like MG because "the whole school thought [he] was loud and gay."  While the parties dispute whether Reed then told MG to "watch his flamboyant hands," Dean Dudley had actual knowledge that, at a minimum, Reed relayed the student's comment to MG.  A rational factfinder, resolving this point in favor of Grace, could conclude that Reed inappropriately advised

MG to "watch his flamboyant hands." While Dudley stated that there was a "conversation that was had" with Reed, it is undisputed that no corrective action was taken against Reed, as per the school's admission. Viewing this evidence in the light most favorable to Grace and in the context of students' treatment of MG, a reasonable jury could infer that Reed's actions, together with the lack of response from the school, exacerbated the hostile educational environment to which MG was already subject.

The Gracefully Grayson incident, and the inferences that a rational factfinder can derive therefrom, support a similar conclusion. After MG personally reported to Dudley and Nissan that students were calling him "gay" and "transgender," but that he was not gay nor transgender, Nissan left a book about a transgender child, well-known by other students in Nissan's classroom, on MG's desk. In view of MG's statement that, after the incident, students called him gay because "they [saw] that a teacher had gotten in the mix[] so they believed it was true," a reasonable jury could infer that the Gracefully Grayson incident reinforced students' perception of MG. School officials, however, directed their attention to Nissan's motivations for her actions rather than to the impact of her actions on MG. Considering that Nissan, before placing the book on MG's desk, knew that students were calling him "gay" and "transgender" without his consent, a reasonable jury could find that both Nissan's actions and the

- 26 -

school's lack of response to them were "unreasonable in light of the known circumstances." See id.

In view of MG's relationship with Freund and the factual disputes surrounding the Post-it notes incident, a reasonable jury could also conclude that school officials acted with deliberate indifference in refusing to transfer MG out of Freund's classroom, subjecting MG to a hostile educational environment. It is undisputed that both Dean Dudley and Assistant Principal Kirby were on notice that, by the sixth grade, MG and Freund had developed a hostile relationship, to the extent that Grace had twice requested MG be transferred out of Freund's classroom. However, despite knowing that the notebook was ineffective in improving MG's relationship with Freund, and despite having three sixth-grade classrooms during that academic year, the school repeatedly declined Grace's requests.

The factual disputes surrounding the Post-it notes incident also support Grace's allegations. A rational factfinder, resolving this conflict in favor of Grace, could find that Freund did throw the Post-it notes at MG, particularly since Dudley and Clark were both on notice that a student had corroborated MG's version of the incident.

Brooke's attempt to equate this case to Porto v. Town of Tewksbury is unavailing. Porto involved repeated instances of harassment whereby the student, RC, sexually harassed another

- 27 -

student, SC, on multiple occasions.  See Porto, 488 F.3d at 73. School officials separated the students after each instance of sexual harassment.  Id. at 74.  They also had the students talk to the school guidance counselor, to whom they promised not to engage in sexual conduct again.  Id.  RC, however, continued to sexually harass SC.  Id.  There, we found that school officials were not deliberately indifferent to the harassment because it was reasonable for them to conclude that the counselor's intervention had worked since they did not become aware of further harassment after that.  See id.  In that context, we held that the "fact that measures designed to stop harassment prove later to be ineffective does not establish that the steps taken were clearly unreasonable in light of the circumstances known[] . . . at the time" and that "a claim that the school system could or should have done more is insufficient to establish deliberate indifference."  Id. at 73-74.

This Court's decision in Porto is easily distinguishable on the facts and the law.  Unlike Porto, school officials at Brooke East Boston were repeatedly made aware, throughout two academic years, of students' treatment of MG.  Here, Grace claims not that the school's measures designed to stop the alleged harassment proved to be ineffective, or that more could have been done in responding to the alleged harassment, but that school officials took no substantive steps to protect MG from the hostile environment he was subject to.

Brooke's reliance on Fitzgerald v. Barnstable School Committee is similarly misplaced. In Fitzgerald, we held that "Title IX does not require educational institutions to take heroic measures, to perform flawless investigations, to craft perfect solutions, or to adopt strategies advocated by parents." 504 F.3d 165, 174 (1st Cir. 2007), rev'd on other grounds, 555 U.S. 236 (2009). There, we found that school officials' actions did not amount to deliberate indifference where they promptly reacted to harassment complaints, commenced full-scale investigations, paid close attention to new information and to the parents' concerns, offered suitable remedial measures, and responded reasonably each time there was a new development. Id. at 174-175. However, as discussed above, the record here reasonably supports opposite inferences: that school officials did not offer suitable remedial measures in light of the claimed harassment and that school officials did not pay close attention to Grace's repeated concerns about students' treatment of MG.

Thus, we find that the record before the district court, the factual disputes therein, and the inferences that a jury could reasonably draw therefrom preclude summary judgment on Grace's Title IX claim. Whether Grace can sustain such a claim is a question for the factfinder at trial.

- 29 -

## III. Conclusion

For the foregoing reasons, we **reverse** the district court's grant of summary judgment on the Title IX claim and **remand** for further proceedings consistent with this opinion.