# United States Court of Appeals
## For the First Circuit

No. 22-1830

M.L., A MINOR, BY AND THROUGH HER FATHER AND NEXT FRIEND, D.L.,

Plaintiff, Appellant,

v.

CONCORD SCHOOL DISTRICT; SCHOOL ADMINISTRATIVE UNIT 8; TERRI
FORSTEN, Superintendent of Concord School District, in her
individual and official capacity; THOMAS SICA, Principal of
Concord High School, in his individual and official capacity;
THOMAS CRUMRINE, Assistant Principal of Concord High School, in
his individual and official capacity; CHALI DAVIS, Assistant
Principal of Concord High School, in her individual and official
capacity; JAMES CORKUM, Assistant Principal of Concord High
School, in his individual and official capacity,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Gelpí, Selya, and Montecalvo,
Circuit Judges.

Jim Davy, with whom All Rise Trial & Appellate was on brief,
for appellant.
Dona Feeney, with whom Friedman Feeney, PLLC, was on brief,
for appellees.

November 16, 2023

**GELPÍ**, **Circuit Judge**.  Appellant M.L., by and through her father, brought suit against School Administrative Unit 8 and the Concord School District (collectively, "Appellees") under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), alleging, among other things, that Appellees exhibited deliberate indifference in their response to her allegations of sexual harassment.  The United States District Court for the District of New Hampshire granted the Appellees' motion for summary judgment.  M.L. appeals.  Although we in no way condone harassment as alleged here, the record does not support the existence of genuine issues of material fact as to whether Appellees' response amounted to deliberate indifference.  Accordingly, we affirm.

## I. Background

We recount the facts in the light most favorable to M.L., the non-moving party at summary judgment.  Johnson v. Johnson, 23 F.4th 136, 139 (1st Cir. 2022).

School Administrative Unit 8 ("SAU 8") is a state-approved unit of school administration organized under the laws of New Hampshire.  SAU 8 is comprised of the Concord School District ("District"), a public school district in Concord, New Hampshire.

During the 2017-2018 school year, students M.L. and L.M. attended Concord High School ("CHS" or "school").[1] At CHS, students were separated into groups known as "Commons." M.L. was assigned to Commons B, where the Assistant Principal was James Corkum ("AP Corkum" or "Corkum"). L.M. was assigned to Commons A, where the Assistant Principal was Thomas Crumrine ("AP Crumrine" or "Crumrine"). Chali Davis ("AP Davis" or "Davis") was the Assistant Principal for Commons D.

## A. Initial Report of Sexual Harassment

On November 29, 2017, Marie Bolster ("Bolster"), a school bus driver, notified M.L.'s father that she believed something happened between M.L. and L.M. on the bus earlier that day and that M.L. did not look normal when she got off the bus. When M.L.'s father raised Bolster's concerns with M.L., she began crying and later told him that L.M. had kissed and touched her on the bus without her consent.

On November 30, 2017, M.L.'s father reported to AP Corkum that L.M. had inappropriately kissed and touched M.L. on the bus the day before. Corkum responded that he would meet with M.L. and involve the School Resource Officer, Mark Hassapes ("SRO Hassapes" or "Hassapes"). That same day, Corkum and Hassapes met

---

[1] M.L., who was a resident of Deerfield, New Hampshire, attended CHS pursuant to a tuition agreement between the Concord School District and the Deerfield School District.

with M.L., who reiterated that L.M. had kissed and touched her on the bus without her consent.

Later that day, AP Corkum, AP Crumrine, and SRO Hassapes then interviewed L.M. L.M. told them that, toward the end of the bus ride, he moved into M.L.'s seat and then M.L. kissed him on the cheek. According to L.M., they held hands for the remainder of the bus ride. After the interview, L.M. made a written statement, in which he added that he and M.L. "kissed once on the bus and from another point of view it might have looked like more;" that his "hands were either on [M.L.'s] hand or on her waist;" and that, at some point during the bus ride, Bolster yelled at him and he told her not to "accuse [him] of things that she [did not] know about."

After interviewing L.M., AP Corkum, AP Crumrine, and SRO Hassapes obtained a written statement from M.L. M.L. wrote that, at some point during the bus ride, "[L.M.] joined seats with [her] in the back of the bus;" that "[L.M.] left his hand on [her] leg and thigh and hand during the majority of the ride;" and that when M.L. "moved up a seat[,] [L.M.] again rejoined [her]." M.L. further wrote that, toward the end of the bus ride, L.M. "began kissing [her] on the mouth and moved his hand up [her] thigh [to] the belt of [her] jeans and [her] chest repeatedly. . . . while moving his hand onto himself" until Bolster "called for [L.M.] to find another seat."

- 5 -

Meanwhile, after his interview, L.M. approached SRO Hassapes and asked him if they could speak "man to man." L.M. told Hassapes that more had happened on the bus than just a kiss, that he knew what he did was wrong, and that he had apologized to M.L. Later on November 30, 2017, AP Crumrine asked L.M. what he meant when he told Hassapes that he knew what he did was wrong. L.M. responded that he and M.L. had kissed on the bus, but they both realized that the kiss was not something they wanted.

Also on November 30, 2017, AP Corkum and AP Crumrine met with two students who were on the bus the day of the incident. According to the school officials, both students said that they did not see anything happen between M.L. and L.M. on the bus.

Toward the end of the day, AP Corkum, AP Crumrine, and SRO Hassapes met with CHS Principal Thomas Sica ("Principal Sica" or "Sica"). After discussing the information obtained to that point, the four of them decided not to proceed with a formal sexual harassment investigation. They listed three factors as support for their decision. First, they thought that there was no conclusive evidence corroborating M.L.'s allegations. Second, they believed that M.L.'s father had indicated that he did not want to proceed with a formal investigation, although M.L.'s father denies saying as much. Third, L.M. had no prior disciplinary issues at CHS.

On December 4, 2017, the District received a written statement from Bolster, detailing her account of the incident. Bolster wrote that she saw what appeared to be the side of L.M.'s head above M.L.'s head "moving in a motion that resembled they were making out." Bolster stated that she saw L.M. sticking out into the aisle "as if he was in a crawling position," and then "his head went toward the window and the making out moves occurred again." Bolster twice instructed L.M. to move to a different seat, but he only moved right before M.L.'s bus stop. Bolster wrote that when M.L. exited the bus, she seemed rigid and stiff, unlike her usually relaxed demeanor. Bolster further indicated that when L.M. got off the bus, he told Bolster to "get [her] facts straight" and threatened to report her to the bus company. Bolster's written statement did not change the school officials' decision not to proceed with a formal sexual harassment investigation.

## B. First Formal Sexual Harassment Investigation

On December 5, 2017, M.L. submitted a second written statement. M.L. wrote that, earlier that day, L.M. sat directly behind her on the bus. M.L. also stated that L.M. contacted her and her brother asking for her father's phone number. M.L. further wrote that she believed L.M. was following her at school because she had seen him in places he usually did not frequent.

That same day, the District opened a formal sexual harassment investigation into the incident and into L.M.'s conduct

thereafter.  AP Crumrine instructed L.M. that he was not to have any contact with M.L. in any manner, "includ[ing] on the bus, in person, over social media, or through other means."

On the morning of December 6, 2017, M.L. and her mother met with AP Corkum and AP Crumrine.  M.L.'s mother explained that it could be difficult for M.L. to discuss the facts of the incident with men.  Crumrine suggested that AP Davis, a woman, could meet with M.L. instead.

AP Davis then interviewed M.L.  During the interview, M.L. stated, for the first time, that L.M. had digitally penetrated her on the bus without her consent.  M.L. told Davis that "she (1) did not want to be on the same bus as L.M.; (2) that she [did not] want to see him [at] school; (3) that she [did not] want [to] have to avoid places where she was comfortable being; and (4) that she ha[d] been going to the library to avoid L.M. during lunch [but] that she would like to be able to stay in the cafeteria."

After the interview, Davis referred M.L. and her mother to Aimee Tucker, a student assistance counselor who later provided counseling to M.L.  Davis shared the results of the interview with AP Corkum, AP Crumrine, and Principal Sica.  Later that day, Crumrine and Sica met with L.M. and his father.  The school officials informed L.M. of M.L.'s new allegation, which L.M. denied.

Meanwhile, AP Corkum met with four other students who were on the bus the day of the incident. Corkum obtained a written statement from one of the students,[2] J.O., in which J.O. stated that M.L. and L.M. had "been sitting together on the bus constantly for the past month or two;" that "they grew more physical" on the bus over time; that "[L.M.] tend[ed] to cuddle with [M.L.] and touch[] her leg;" and that J.O. had "watched them kiss every once [in] a while."

Also on December 6, 2017, school officials received a partial video of the bus ride from Dail Transportation, the company that provides bus transportation to the District. AP Corkum reviewed and summarized the video. In his summary, Corkum noted that the video showed M.L. and L.M. sitting together in the back of the bus, but, because of the camera angle, he could not determine whether there was physical contact between them. The video, however, did confirm that Bolster twice instructed L.M. to move away from M.L., but that he only moved to allow M.L. to exit the bus. The video also confirmed that, as L.M. exited the bus, he told Bolster to "make sure [she had her] facts straight" and threatened to report her to the bus company. After reviewing the

_____

[2] According to Corkum, he met with students J.O., C.T., N.H., and A.B., and obtained written statements from two of them. However, the record contains only J.O.'s written statement.

partial video, Corkum requested a video of the entire bus ride from Dail Transportation.

On December 7, 2017, AP Crumrine told M.L.'s parents that there was no conclusive evidence as to the incident. On December 11, 2017, the District received the video of the entire bus ride from Dail Transportation. AP Corkum, AP Crumrine, AP Davis, and Principal Sica met to review the video, and Corkum again summarized its contents. According to Corkum, the video showed M.L. and L.M. sitting together. L.M. then moved up one seat, and M.L. moved to the seat across from his. L.M. then joined M.L. in her seat and leaned in toward her. Corkum noted that it appeared as though M.L. then leaned in toward L.M. L.M. leaned back toward M.L., until Bolster addressed L.M.

That same day, after reviewing the video, the school officials finalized the investigation. First, they concluded that L.M. had violated the school's sexual harassment policy by committing unwanted physical contact when he kissed M.L. and touched her hand or waist on the bus. Second, they concluded that L.M. threatened and was insubordinate to Bolster during the bus ride. As for punishment, AP Crumrine issued L.M. a formal no-contact order prohibiting him from contacting M.L. in any manner, including by proxy. The order defined "contact" broadly, including contact through texting, calling, and social media. The order instructed L.M. that if he found himself in the same hallway

or space as M.L., he was to stay at least ten feet apart from her or leave the area entirely. Failure to abide by the order could result in a suspension or in other penalties deemed appropriate by school officials. In addition to the no-contact order, L.M. was suspended from riding the bus for ten days and was assigned a seat at the front of the bus upon his return.

AP Crumrine sent letters to M.L.'s parents and L.M.'s father informing them of the findings of the investigation and the punishment imposed on L.M. In or around December 2017, the District referred M.L.'s allegation that L.M. had digitally penetrated her on the bus to the Deerfield Police Department.[3]

In early January 2018, M.L. reported to AP Corkum that she had seen L.M. in the hallway where she usually was in the mornings. Corkum relayed that information to AP Crumrine, who met with L.M. Crumrine concluded that L.M. was in the hallway for legitimate reasons but nonetheless instructed L.M. to avoid that area in the mornings.

On January 19, 2018, the Deerfield Police Department notified M.L.'s parents that they completed their investigation and would not bring charges against L.M.

---

[3] It is unclear from the record which school official contacted the Deerfield Police Department.

## C. Second Formal Sexual Harassment Investigation

On January 22, 2018, M.L.'s parents sent a letter to the District's Superintendent, Terri Forsten ("Superintendent Forsten" or "Forsten"), expressing their disagreement with the outcome of the investigation. M.L.'s parents informed Forsten that, despite the no-contact order, M.L. still believed that L.M. was following her at school.

On January 24, 2018, Superintendent Forsten and Principal Sica met with M.L.'s parents. M.L.'s parents alleged that L.M. was retaliating against M.L. and informed the school officials of a text exchange between L.M. and A.C., M.L.'s friend. L.M. told A.C. that M.L. was not who A.C. thought she was and that "[p]eople [were going] to learn what [it was] like to have [their] life fucked up." M.L.'s parents stated that M.L. was no longer riding the bus since L.M.'s suspension had ended and requested alternative transportation for M.L. M.L.'s parents also requested that L.M. be expelled from CHS.

That same day, Superintendent Forsten opened a second formal sexual harassment investigation into the allegations of retaliation, the allegations that L.M. violated the no-contact order, and the underlying allegations of sexual harassment. Forsten assigned AP Davis to conduct the second investigation.

School officials thought that M.L. would feel more comfortable and supported in Commons D, which had all-female

administrators. Thus, on January 25, 2018, the District transferred M.L. from Commons B to Commons D. AP Davis spoke to M.L.'s teachers and requested that they give M.L. extra time to complete her coursework. M.L. was introduced to Karen Slick, her new guidance counselor.

On February 1, 2018, M.L's parents informed Superintendent Forsten that M.L. was seeing L.M. on Mondays before her math class because M.L. and L.M. had the same math teacher and L.M.'s math class was right before hers. On February 5, 2018, AP Davis met with M.L. and provided her different travel routes to avoid seeing L.M. before her math class. M.L. chose one route and AP Crumrine instructed L.M. to use a different one. The math teacher, however, was not informed of the no-contact order.

On February 6, 2018, M.L. reported to AP Davis that L.M. had passed by the hallway where she sat in the mornings. AP Crumrine instructed L.M. that he could not be anywhere near that hallway and reminded him that the no-contact order remained in effect. That same day, Principal Sica sent a letter to M.L.'s parents informing them that the District had opened a second investigation. The letter also stated that L.M. had been informed that retaliation against anyone who raised a concern or participated in the investigation was strictly prohibited.

Meanwhile, AP Davis conducted the second investigation. She reviewed the entire bus ride video on a Dail Transportation

laptop, which had "slightly improved quality" than the video the District had previously received. Davis created a chart comparing the video to M.L. and L.M.'s previous statements about the incident. While making this comparison, Davis thought that the video contradicted M.L.'s previous statements about the incident. From the video, Davis noted that, when L.M. moved away from his shared seat with M.L., M.L. "immediately followed him and sat in the seat across the aisle from him." She further noted that, approximately one minute before Bolster called out to L.M., M.L.'s hands appeared to be "reaching out to [L.M.'s] head -- not to push away, but to pull toward her." Davis noted that M.L.'s hands appeared around L.M.'s head at least twice, and that M.L. "lean[ed] in and toward him during the physical interaction." According to Davis, and contrary to Bolster's written statement, L.M.'s body did not extend out into the aisle in a crawling position. Davis shared the video with AP Crumrine and SRO Hassapes, both of whom agreed with her assessment.

As part of the second investigation, AP Davis also interviewed other students, including A.C. and S.D. A.C. provided Davis with a screenshot of the text messages in which L.M. told A.C. that M.L. was not who A.C. thought she was and that "[p]eople [were going] to learn what [it was] like to have [their] life fucked up." S.D., who was L.M.'s girlfriend at the time of the incident, provided Davis with screenshots of text messages that

- 14 -

L.M. had sent S.D. seemingly within the timeframe of the incident, in which L.M. told S.D. that he "fe[lt] sick to [his] stomach for some reason . . . like [he] did something horrible."

On February 20, 2018, AP Davis emailed Superintendent Forsten a report of the second investigation along with her conclusions. In her email, Davis stated that the first investigation's finding of "unwanted physical contact" was not substantiated because "the evidence provided by the witnesses and by the bus video as well as the statements of [M.L.] and [L.M.] [did] not prove that the physical interaction on the bus was non-consensual." Davis further stated that, "[w]hile the possibility of an unwanted sexual encounter . . . might have occurred, it [was] impossible to say with certainty given conflicting interviews, a questionable bus driver report, and the bus videos which seem[ed] to point to willing participation."

On March 2, 2018, Superintendent Forsten sent a letter to M.L.'s parents informing them of the outcome of the second investigation. As stated in the letter, the second investigation concluded that L.M. did not violate the school's sexual harassment policy because, although the school officials concluded that L.M. "initiated sexual behavior as described by [M.L.] on the school bus," school officials found that, "more probably than not, [M.L.] did not indicate that the behavior was unwelcome at the time of the event." As support for this conclusion, Forsten cited the

- 15 -

school officials' assessment of the bus ride video as well as J.O.'s written statement. Forsten indicated that "[t]he investigators were mindful that consenting to kissing on the bus on a prior occasion does not mean that kissing is always welcomed conduct, but in light of the video evidence, the investigators found that the kissing was more likely than not welcomed conduct."

As to the allegations of retaliation, Forsten stated that "[L.M.] more probably than not sent text messages to [A.C.] intending to threaten [M.L.] and to retaliate against [M.L.] because of her report of sexual harassment" and thus violated the no-contact order and the District's prohibition of retaliation.

As a result of the second investigation, L.M. was suspended from CHS for four days. Upon L.M.'s return to school, he was required to have at least four meetings with his school counselor. M.L.'s parents disagreed with the findings of the second investigation. In March 2018, M.L. transferred to Oyster River High School.

### D. Procedural History

In April 2018, M.L., by and through her father, brought suit against Appellees, asserting a claim of student-on-student sexual harassment under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).[4] Appellees moved for summary judgment.

---

[4] In her complaint, M.L. also asserted a 42 U.S.C. § 1983 claim against Appellees, as well as § 1983 and common law

In a Memorandum and Order, the district court granted summary judgment in favor of Appellees, finding that "M.L. [could not] show that [Appellees] were deliberately indifferent in their handling of her complaints." First, the district court concluded that, even construed in the light most favorable to M.L., the record could not show that Appellees were deliberately indifferent in their attempts to protect M.L. Second, the district court concluded that "the school's investigations, although imperfect, were not so lacking in either scope or execution to render them clearly unreasonable under the circumstances."

This timely appeal followed.

## II. Discussion

On appeal, the parties dispute only whether the District's response to M.L.'s allegations of sexual harassment constituted deliberate indifference. Thus, we write narrowly and focus on whether genuine issues of material fact exist as to deliberate indifference so as to preclude summary judgment. See Fed. R. Civ. P. 56(a).

### A. Standard of Review

We review the district court's grant of summary judgment de novo, construing the record in the light most favorable to the non-moving party. Walsh v. Unitil Serv. Corp., 64 F.4th 1, 5 (1st

_____

negligence claims against Forsten, Sica, Crumrine, Davis, and Corkum. However, these claims were voluntarily dismissed.

- 17 -

Cir. 2023); Air-Con, Inc. v. Daikin Applied Latin Am., LLC, 21 F.4th 168, 175 (1st Cir. 2021). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those 'that might affect the outcome of the suit under the governing law.'" Morrissey v. Bos. Five Cents Sav. Bank, 54 F.3d 27, 31 (1st Cir. 1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "A 'genuine' issue is one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, . . . would permit a rational factfinder to resolve the issue in favor of either party." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).

**B. Student-on-Student Sexual Harassment Under Title IX**

Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has interpreted the statute to confer a private right of action under which an aggrieved party may seek money damages against an educational institution. See Cannon v. Univ. of Chi., 441 U.S. 677, 717 (1979); Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 65 (1st Cir. 2002).

Here, M.L. asserts a theory of hostile environment harassment. Under such a theory, an educational institution may be liable for student-on-student sexual harassment. See Grace v. Bd. of Trs., Brooke E. Bos., 85 F.4th 1, 10-11 (1st Cir. 2023); Porto v. Town of Tewksbury, 488 F.3d 67, 72 (1st Cir. 2007). To prevail on such a claim, a student must first show that the educational institution is a recipient of federal funding and is thus covered by Title IX. See 20 U.S.C. § 1681(a); Fitzgerald v. Barnstable Sch. Comm., 504 F.3d 165, 171 (1st Cir. 2007), rev'd on other grounds, 555 U.S. 246 (2009). Then, the student must prove that (1) "he or she was subject to 'severe, pervasive, and objectively offensive' sexual harassment by a school peer;" (2) "the harassment caused the [student] to be deprived of educational opportunities or benefits;" (3) the educational institution knew of the harassment (4) in its programs or activities; and (5) the institution was deliberately indifferent to the harassment. Porto, 488 F.3d at 72-73.

Here, the parties dispute only the fifth element, whether Appellees were deliberately indifferent to M.L.'s allegations of sexual harassment. "The Supreme Court has described deliberate indifference as 'a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action' or inaction." Porto, 488 F.3d at 73 (quoting Bd. of the Cnty. Comm'rs v. Brown, 520 U.S. 397,

- 19 -

410 (1997)).  This standard "requires more than a showing that the institution's response to harassment was less than ideal." Fitzgerald, 504 F.3d at 171.  Instead, the institution's response to the harassment, or lack thereof, must have been "clearly unreasonable in light of the known circumstances." Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 648 (1999).  The institution's response must have caused the student to undergo harassment or make the student vulnerable to it.  See id. at 646.  If the institution "learns that its measures have proved inadequate, it may be required to take further steps to avoid" liability under Title IX.  Wills v. Brown Univ., 184 F.3d 20, 26 (1st Cir. 1999). Thus, an institution may be liable under Title IX "where it had notice of the sexual harassment, and either did nothing or failed to take additional reasonable measures after it learned that its initial remedies were ineffective."  Porto, 488 F.3d at 74.

Title IX does not require educational institutions to "take heroic measures, to perform flawless investigations, to craft perfect solutions, or to adopt strategies advocated by parents."  Fitzgerald, 504 F.3d at 174.  Thus, a claim that an institution could or should have done more does not establish deliberate indifference.  Porto, 488 F.3d at 73.  We have "no roving writ to second-guess an educational institution's choices from within a universe of plausible investigative procedures." Fitzgerald, 504 F.3d at 175.  Instead, our inquiry is limited to

"whether the school's actions were so lax, so misdirected, or so poorly executed as to be clearly unreasonable under the known circumstances."  Id.

### C. Analysis

On appeal, M.L. puts forth several bases for her conclusion that genuine issues of material fact exist as to deliberate indifference.  We consider each in turn.

M.L. first contends that the District exhibited deliberate indifference when it "unreasonably delayed" opening a formal investigation until after M.L.'s second written statement on December 5, 2017.  We are not persuaded.

M.L. acknowledges that AP Corkum met with and obtained a written statement from her on November 30, 2017, the very day that M.L.'s father first informed Corkum of M.L.'s initial allegations.  That same day, school officials also met with and obtained a written statement from L.M.  Also on November 30, 2017, school officials met with two students who did not corroborate M.L.'s allegations.  Toward the end of that day, school officials met and decided not to proceed with a formal sexual harassment investigation.  Given their inability to corroborate M.L.'s allegations on the same day the allegations were made, there is no genuine issue of material fact as to whether the school officials' decision not to proceed immediately with a formal investigation was clearly unreasonable in light of the known circumstances at

the time.  See Davis, 526 U.S. at 648.  "Title IX was not intended either to pretermit thoughtful consideration of students' rights or to demand a gadarene rush to judgment.  After all, in situations involving charges of peer-on-peer harassment, a public school has obligations not only to the accuser but also to the accused." Fitzgerald, 504 F.3d at 174.

By citing Roussaw v. Mastery Charter High School, M.L. only emphasizes how the District's decision to delay a formal investigation was not clearly unreasonable.  There, the district court found that the school made the student vulnerable to harassment when it took no action to address the sexual harassment for thirteen days after the student reported it.  See No. 19-1458, 2020 WL 2615621, at *6-7 (E.D. Pa. May 22, 2020).  The facts here, however, are materially distinguishable from those in Roussaw. The District not only met with M.L., L.M., and potential witnesses on the same day of M.L.'s initial report of sexual harassment but also opened its first investigation and issued a verbal no-contact order to L.M. just five days after.  In light of these facts, there is no genuine issue of material fact as to whether the District exhibited deliberate indifference when it began its investigative process the same day of M.L.'s initial report of sexual harassment and opened a formal investigation less than a week thereafter.

M.L.'s second argument is that the District's initial measures were unreasonable.  Specifically, she suggests that the

District "set its no[-]contact order up to fail" by not notifying M.L. and L.M.'s math teacher of the same, and that the District acted unreasonably by "affirmatively le[aving] L.M. and M.L. on the same bus where it already kn[ew] that he had assaulted her." The record, however, construed in the light most favorable to M.L., cannot reasonably support a finding that the District's initial measures were clearly unreasonable in light of the known circumstances. See Davis, 526 U.S. at 648.

First, as the district court noted, the no-contact order was reasonably broad in scope, prohibiting L.M. from contacting M.L. in any manner, including by proxy as well as through texting, calling, and social media. That M.L. saw L.M. before her math class because both students had the same math teacher does not render the order clearly unreasonable. "[T]he fact that measures designed to stop harassment prove later to be ineffective does not establish that the steps taken were clearly unreasonable in light of the circumstances known by [the District] at the time." Porto, 488 F.3d at 74. And when the District was notified that the order had been ineffective in keeping the students separated before M.L.'s math class, AP Crumrine assigned a different travel route to L.M. That the District did not notify the math teacher of the order also fails to render the order clearly unreasonable, particularly in light of Crumrine's action to ensure that the students remained separated before M.L.'s math class.

- 23 -

Second, the record evidences that the District did more than leave M.L. and L.M. on the same bus. School officials suspended L.M. from riding the bus for ten days and assigned him a seat at the front of the bus upon his return. In addition to this, the no-contact order instructed L.M. to stay at least ten feet away from M.L. if he found himself in the same space as her. In hindsight, there may be other avenues that the District could have perhaps taken, such as finding alternative transportation for M.L. or expelling L.M. altogether as requested by M.L.'s parents. Title IX, however, does not require educational institutions "to craft perfect solutions[] or to adopt strategies advocated by parents." Fitzgerald, 504 F.3d at 174. Thus, there is no genuine issue of material fact indicating that the District's decision to temporarily suspend L.M. from the bus and assign him a seat upon his return was clearly unreasonable in light of the known circumstances. See Davis, 526 U.S. at 648.

M.L.'s third contention is that the District exhibited deliberate indifference when it unreasonably imposed a burden on M.L. to protect herself by "'provid[ing] her with options to prevent' her from having to see L.M. . . . [and] mov[ing] her to an all-female Commons[] without altering L.M.'s assignments." This argument, however, mischaracterizes the District's actions. The two times that M.L. reported having seen L.M. in the school hallway, AP Crumrine instructed L.M., not M.L., to avoid that area.

In February 2018, when M.L. reported that she was seeing L.M. before her math class, AP Davis presented M.L. with different travel routes; M.L. chose her preferred one, whereas L.M. was instructed to use a different one. Furthermore, the record reflects that the purpose of the District's decision to transfer M.L. to Commons D was not to impose a burden on M.L., but to ensure that M.L. felt comfortable and supported at CHS. The record also illustrates that this decision was taken in addition to, not in substitution for, the implementation of remedial measures, such as the no-contact order.

M.L.'s fourth argument is that the District exhibited deliberate indifference by "unreasonably fail[ing] to change course when its actions proved immediately ineffective." See Porto, 488 F.3d at 74 (stating that an institution may be liable under Title IX "where it had notice of the sexual harassment, and either did nothing or failed to take additional reasonable measures after it learned that its initial remedies were ineffective"); Wills, 184 F.3d at 26 (stating that if an institution "learns that its measures have proved inadequate, it may be required to take further steps" to avoid liability under Title IX). Specifically, M.L. contends that the District did nothing to address M.L.'s allegations that L.M. violated the no-contact order and retaliated

against her.[5]  In light of the record, however, there is no genuine issue of material fact suggesting that the District did nothing to address such allegations.

On December 5, 2017, the very day that M.L. submitted her second written statement, the District opened its first investigation, which resulted in L.M. receiving a no-contact order and a temporary suspension from the bus.  As part of its first investigation, the District referred M.L.'s allegations to the Deerfield Police Department.  With respect to the instances in which M.L. reported having seen L.M. at CHS, school officials instructed L.M. that he could not be near M.L.  When M.L.'s parents notified the District that L.M. had sent a threatening text message to A.C., school officials opened a second investigation and subsequently advised L.M. that retaliation was strictly prohibited.  The second investigation concluded that, by sending the text message, L.M. violated the no-contact order as well as the District's prohibition of retaliation.  As a result, L.M. was temporarily suspended from CHS.  In light of these undisputed facts, M.L. seems to argue not that the District did nothing to

---

[5] M.L. also argues that "L.M.'s campaign of retaliation in violation of the no[-]contact order contributed to even longtime friends of M.L.'s, like A.B., amplifying the trauma of her assault by parroting L.M.'s talking points to her. . . . And L.M.'s girlfriend, S.D., texting inaccurate gossip about a nonexistent lawsuit compounded the issue."  There is, however, no evidence that L.M. solicited or instigated those messages.

address her allegations, but that the District should have done more. Even so, M.L. must do more than merely "claim that the school system could or should have done more." Porto, 488 F.3d at 73.

M.L.'s fifth and final argument is that the District's investigations were poorly executed. First, M.L. contends that the District inexplicably ignored L.M.'s statement to SRO Hassapes that more had happened on the bus than just a kiss as well as L.M.'s text messages to S.D. on the day of the incident; that the District unreasonably scrutinized Bolster's written statement; and that the District failed to interview M.L.'s school counselor. Second, M.L. contends that AP Davis used the video of the bus ride to "conclude solely via divination of body language that M.L. had purportedly consented to kissing L.M."

We interpret M.L.'s first contention as suggesting other investigative avenues that the District might have taken. And, as the district court noted, the District's investigations were far from perfect. But as we have already said, we have "no roving writ to second-guess [the District's] choices from within a universe of plausible investigative procedures." Fitzgerald, 504 F.3d at 175. As to M.L.'s second contention, a few points are worth noting. We do not, in any way, condone the allegations underlying this action. We have been clear that a "school should be a haven for a youngster, and sexual harassment in a[] school is

never to be condoned." Id. at 171. But we are also mindful that "school officials face a daunting challenge in maintaining a safe, orderly, and well-disciplined environment." Id. As part of the second investigation, Davis interviewed potential witnesses and students who had prior interactions with M.L. and L.M. She also reviewed the entire bus ride video and made a chart comparing the video to M.L. and L.M.'s previous statements about the incident. Two other school officials also reviewed the video and agreed with Davis's assessment. Thus, the record does not reasonably support a finding that the second investigation was "so lax, so misdirected, or so poorly executed as to be clearly unreasonable under the known circumstances." Id. at 175.

The District's response was not perfect. But perfection is not the test. And after careful consideration of M.L.'s arguments, the facts, and the law -- while construing the record in the light most favorable to her -- we find that the record cannot reasonably support a finding that the District's response was clearly unreasonable in light of the known circumstances. See Davis, 526 U.S. at 648. Thus, the district court appropriately granted summary judgment in favor of Appellees on the Title IX claim.

### III. Conclusion

For the reasons stated above and those given by the district court, we **affirm**.